**UNITED GAS PIPE LINE COMPANY,**

v.

**FEDERAL POWER COMMISSION.**

No. 14985.

United States Court of Appeals,
Fifth Circuit.

March 25, 1955.

Rehearing Denied May 12, 1955.

2. Compare Texas Pac. Coal & Oil Co. v. Truesdell, Tex.Civ.App., 187 S.W.2d 418; Carter v. Simmons, supra.

W. Scott Wilkinson, C. Huffman, Lewis, W. O. Crain, E. J. Freiberg, George D. Fiser, J. C. Ohrt, Shreveport, La., Wilkinson, Lewis & Wilkinson, Shreveport, La., Morton E. Yohalem, Washington, D. C., of counsel, for petitioner.

William A. Dougherty, James Lawrence White, New York City, for intervenor, Miss. River Fuel Corp.

Lambert McAllister, Asst. Gen. Counsel, Willard W. Gatchell, Gen. Counsel, Reuben Goldberg, Abraham R. Spalter, Washington, D. C., Attys. for respondent, Federal Power Commission.

Before HOLMES and BORAH, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

United Gas Pipe Line Company (called United) seeks review of an order of respondent, Federal Power Commission (called Commission), requiring petitioner to pay Mississippi River Fuel Corporation (called Mississippi) $2,836,293.43 found to be due under rates filed with the Commission by United. The proceeding arises under Section 19(b) of the Natural Gas Act of June 21, 1938, chapter 556, 52 Stat. 821, and U.S.C.A. Title 15, § 717r and Section 10 of the Administrative Procedure Act of June 11, 1946, chapter 324, 60 Stat. 237, U.S.C.A. Title 5, §§ 1001–1011.

Petitioner is engaged in the transportation and sale of natural gas in interstate commerce in the states of Texas, Louisiana, Mississippi, Alabama and Florida, and Mississippi operates a pipe line from the Louisiana and Texas gas fields to St. Louis, Missouri, supplying consumers en route as well as in said city and surrounding areas.

The proceedings before the Commission originated by a "petition for relief"

filed by Mississippi on August 4, 1952 (Docket No. G-2024) seeking to compel United to "make such accounting or render such report or reports as will indicate as of March 1, 1951, and March 1, 1952," proper amounts in the commodity charges for gas purchased by Mississippi from United during said periods in compliance with its rates filed with the Commission. Mississippi alleged that due to the "absence of positive and definitive action and decision" by the Commission "Mississippi is not in position to pursue any legal remedy it may have against United to recover any amounts due therefrom or to determine whether in fact any amounts are due from" United. On September 5th following, United filed a motion to dismiss said petition on the ground that there was then pending before this Court (No. 13,-958, 203 F.2d 78) a proceeding in which United was seeking review of an order of dismissal by the Commission of its own petition (United's No. G-1804 hereafter referred to) for a declaratory order that it, United, owed Mississippi nothing; that Mississippi had intervened therein and every issue raised by Mississippi's proceeding (Docket No. 2024) before the Commission would be settled thereby. United prayed that Mississippi's petition for relief in said No. 2024 be dismissed, and in the alternative, stayed until a decision by this Court of the issues in said case No. 13,958.

On December 5, 1952, the Commission issued its order (Docket No. 2097) of its own motion for an investigation to enable it to determine "the correct amount of the adjustment in the charges of United to Mississippi for natural gas sold and delivered" during the said twelve-months periods ending March 1, 1951 and March 1, 1952.

The two proceedings, Nos. 2024 and 2097, were consolidated for the purposes of hearing, and on December 5, 1952, the Commission set a hearing for January 26, 1953, and ordered United to submit "in writing and under oath" ten days prior thereto the volume of gas delivered to Mississippi during the periods involved, the prices paid therefor and the amount, if any, of "surplus gas purchased in the Carthage Field." United complied by filing the affidavit on January 15, 1953, giving the information required and disclosing only a small amount of gas had been delivered from the Carthage Field. It also filed its motion to dismiss the consolidated proceedings for many of the same reasons as stated in No. 2024 above and for the further reason that Commission's No. G-2097 did not conform to the requirements of the Administrative Procedure Act in that it failed to disclose authority and jurisdiction for the investigation. This motion also set forth in considerable detail what had been done by the parties and the Commission prior to the proceedings before the latter.

The facts are not seriously disputed and, insofar as this controversy is concerned, will be confined to the period beginning September 7, 1945. On that date United and Mississippi entered into a contract designated in the Commission's files as Supplement No. 11 to United's Rate Schedule FPC Nos. 9, 10 and 11 for the sale by United to Mississippi of a maximum of 73,000 Mcf per day of natural gas at a two-part rate consisting of a demand charge of 38¢ per Mcf per Billing Month, and a commodity rate of 5¢ per Mcf (Article 4 of said contract). The contract further provided that Mississippi should have the right to increase its requirements in such amount as it might specify on or before May 1st of any year, delivery to begin November 1st of the year in which said notice was given and to continue until November 1st, 1966, "* * * provided Seller had on the date of receipt of said notice line capacity in said Carthage-Monroe Line, in addition to the requirements of its then existing commitments, available to deliver such increased quantity of gas specified in any such notice at the delivery point herein established." It was further stipulated that if Seller did not have sufficient capacity, it would increase the same as required, provided Mississippi would advance United the funds for making such

increase in capacity not to exceed $1,500,-000, to be repaid in equal annual installments with interest over the period of the contract. With respect to prices to be paid, it was stipulated: *"For such increased quantities of gas the price provided for in this agreement shall be adjusted by appropriate revision of the Demand and Commodity Charge, respectively, to compensate Seller for all of Seller's increased cost resulting from such increased capacity."* (Emphasis supplied.)

Article 9 of said agreement further provided:

"Seller shall promptly file a copy of this agreement, *as a rate schedule,* with the Federal Power Commission, *together with such schedules and notices with respect to this agreement and any changes effected thereby as may be required or contemplated by the provisions of the Natural Gas Act and the orders, rules and regulations of said Commission.* Seller shall promptly apply to the Federal Power Commission for the specific authorization to transport through its said Carthage-Monroe Line and sell the gas required for delivery hereunder.

"This agreement shall not become effective unless (i) the same is permitted to become effective, *as a rate schedule* and without suspension of the rates herein agreed upon, by action or inaction of the Federal Power Commission and (ii) the Federal Power Commission permits Seller to transport through its said Carthage-Monroe Line and sell the full quantities of gas required for delivery hereunder *'as Additional quantities',* as such term is used in paragraph (B) of the Order issued on July 5, 1945, by said Commission in Docket No. G-622." (Emphasis supplied.)

On March 28, 1949, Mississippi notified United of its desire to increase its purchases to 195,000 Mcf per day beginning November 11th and requested the latter to provide capacity in the Carthage-Sterlington Line accordingly. Thereafter on November 16, 1949, the parties amended their agreement to correspond to this notice and United filed the same with the Commission as "Supplement No. 15 to United's Rate Schedules". This agreement also increased the price of gas from 38¢ (Demand) to 45¢ and from 5¢ to 6.5¢ per Mcf (Commodity), the purpose being to compensate United for its increased investment in pipe line facilities necessary to enable it to deliver this additional 122,000 Mcf per day through the Carthage-Monroe line. In proceeding No. G-1252, before the Commission for a certificate of public convenience and necessity to construct additional facilities to carry it out, this agreement was designated as Exhibit No. 3. On November 16, 1949, United wrote a letter to Mississippi, calling attention to the fact that this agreement was to be supplemented by "a letter agreement", identified in said proceeding as Exhibit No. 4. The letter also stated:

" * * * United's representatives further stated that even if the said Exhibits Nos. 3 and 4 became effective *the rates and charges therein provided for would be tentative only and in an appropriate proceeding United would timely ask for a proper revision of the rates and charges provided in said agreements.*

"In order that Exhibits Nos. 3 and 4 may be filed as rate schedules and become effective as such, under the Rules and Regulations of the Federal Power Commission, as they existed prior to December 1, 1948, it will be necessary that Mississippi River Fuel Corporation and United execute said documents." (Emphasis supplied.)

Copies of exhibits 3 and 4 were enclosed for Mississippi's signature. We also quote from the letter agreement, Exhibit No. 4 (Supplement No. 1 to Supplement No. 15) as follows:

"It is anticipated that the additional gas requested * * * by letter dated March 28, 1949, must be supplied by *United Gas Pipe Line*

*Company by purchase of surplus gas in the Carthage Field.* United is *entering into purchase contracts for the purchase of this surplus gas.* These purchase contracts are for twenty (20) years, and the price to be paid thereunder is on a sliding scale of 7½ *cents per Mcf* for the first 5-year period, increasing one cent each 5 years to 10½ cents for the final 5-year period.

"*Due to variations in the market demands of both United and others now withdrawing gas from Carthage Field, the amount of surplus gas purchases may, in any year, be less than the amount estimated by United to supply the increased requirements of Mississippi River Fuel Corporation. It is the intention of United, as of March 1st of each year, to make an appropriate adjustment in the commodity charge as set out in its amendatory agreement with Mississippi River Fuel Corporation dated November 16, 1949, in the event that the surplus gas purchases, chargeable to Mississippi River Fuel's increased demand as set out in said agreement, shall be less than 122/195 of Mississippi River Fuel's total requirements from United. The amount of the adjustment, and the method of calculation, shall be approved by the Federal Power Commission.*

"United also serves from the Carthage Field certain other customers, namely, Texas Eastern Transmission Corporation, Southern Natural Gas Company, and certain local markets. *In the event that United should increase its contractual commitments to Texas Eastern or Southern over that presently in effect or should increase its deliveries from said Field to its local markets over an average daily delivery of 25,000 Mcf, all purchases by United under its surplus gas contracts shall be allocated between the above markets and Mississippi River Fuel Corporation in the proportion that the Mis-*

*sissippi River Fuel Corporation increase bears to all increases over the commitments in effect on March 28, 1949.* For the purpose of this computation, the prior commitment of United to Mississippi River Fuel shall be taken as 73/195 of the increased commitment resulting from the agreement of November 16, 1949.

"If the foregoing is acceptable to you, please so indicate by executing in the space provided below and returning to us the enclosed duplicate hereof." (Emphasis supplied.)

Mississippi signed the contract (Exhibit No. 3) and acknowledged the letter in this form:

"The undersigned hereby acknowledges receipt of the above and foregoing letter with enclosures as therein stated. The undersigned expressly stipulates that nothing done by it in connection with Docket No. G-1252 and the execution of this acknowledgement shall in anywise prejudice any rights of the undersigned under that certain contract with United of date September 7, 1945."

The agreement (Supplement No. 15 to Schedules 9, 10 and 11) and the letter (Supplement No. 1 to Supplement No. 15) were also filed with the Commission on November 23, 1949, and on November 27th following were "allowed to take effect as of December 8, 1949" by an order of the Commission which contained a provision:

"(C) United shall file as of March 1 in each year the amount of the proposed adjustment in the commodity charge, referred to in said Supplement No. 1 to Supplement No. 15, the method of calculation of such adjustment, and such other details as may be requested by the Commission, and such filing shall be made each year whether or not any adjustment is contemplated by United."

During the first months of delivery, December 13, 1949, to February 28, 1950, United purchased no surplus gas in the Carthage Field at 7½¢ per Mcf and on May 23rd filed with the Commission a proposed accounting for that period, showing the amount due Mississippi as $201,893 and requested the Commission's approval. This sum represented the difference between monthly billings for 12,887,462 Mcf of gas delivered at the "rolled-in" rate of 6½¢ per Mcf and 5¢ per Mcf, which United chose to apply, as shown by Exhibit A attached to the letter dated May 19, 1950, transmitting the proposed settlement to the Commission. In said letter, United gave as its authority for making the adjustment Section (C) (above) which it quoted and the order of the Commission dated December 27, 1949, made effective as of December 8 of the same year. On June 27, 1950, the Commission issued its order approving the settlement again quoting said Section (C) of Supplement No. 1 to Supplement No. 15 and adding:

"It appears that for the period involved, from December 13, 1949 to February 28, 1950 inclusive, United purchased no gas at a price of 7½ cents per Mcf for delivery to Mississippi River Fuel Corporation, as a consequence of which as an adjustment of $201,893 *is proposed to reflect a reduction in the unit commodity price from 6½ cents to 5 cents per Mcf.*

"Good cause has been shown for permitting the aforesaid supplemental rate schedule to become effective as of December 13, 1949.

"The Commission orders:

"(A) The aforesaid described rate schedule be and it is hereby allowed to take effect at the date designated, and shall be deemed to have been filed and published in compliance with the Natural Gas Act.

"(B) Nothing contained in this order shall be construed as a waiver of the requirements of Section 7 of the Natural Gas Act, as amended;

nor shall it be construed as constituting approval by this Commission of any service, rate, charge, classification, or any rule, regulation, contract or practice affecting such service or rate provided for in the above-described Rate Schedule nor shall this order be deemed as recognition of any claimed contractual right or obligation affecting or relating to such service or rate.

"(C) This order is without prejudice to any findings or orders which have been or may hereafter be made by this Commission in any proceeding now pending, or hereafter instituted, by or against the Applicant." (Emphasis supplied.)

During the next period, March 1, 1950, to February 28, 1951, United also purchased no surplus gas from the Carthage Field for delivery to Mississippi, and in its letter to the Commission dated April 24, 1951, after again quoting from the above Supplement No. 1 to Supplement No. 15, and referring to the Commission's order of December 27, 1949, with respect to Supplement No. 15 and Supplement No. 1 to Supplement No. 15, stated that "in compliance" therewith, it enclosed Exhibit A "showing our proposed adjustment and the amount due Mississippi hereunder." United then explained:

"At the time United negotiated Supplement No. 1 to Supplement No. 15, United intended to purchase surplus gas from various producers in the Carthage Field, at a price of seven and one-half cents (7½¢) per Mcf, to supply the additional gas required by Mississippi River Fuel.

"However, various developments in the purchase negotiations influenced United to temporarily abandon its efforts to purchase such surplus gas from the producers; and in lieu of these arrangements, United, in order to obtain additional gas for Mississippi River Fuel, entered into an exchange agreement with Texas Eastern Transmission Corporation, dated April 24, 1950 (Rate Schedule

No. 109), under which Texas Eastern agreed to deliver to United in its Carthage-Sterlington line, gas which Texas Eastern had available from its 20″ transmission line near Castor, Louisiana, in excess of its own requirements. Texas Eastern charges United for all gas delivered to it under this contract at the rate of seven and one-half cents (7½¢) per Mcf by deducting said amount from the bill for the deliveries by United to Texas Eastern at Longview under the contract between said parties, dated June 20, 1947.

"*Accordingly, the adjustment in the commodity charge to Mississippi River Fuel Corporation has been based on the quantity of gas which United received from Texas Eastern under said contract during the period under consideration, which quantity and the price charged United therefor were then 'rolled in' with the 5¢ price in the same manner as was done to obtain the 6.5¢ commodity charge provided for in said Supplement No. 15.*" (Emphasis supplied.)

The monthly billings disclosed a total of $5,606,022.27 based upon the application of the rate of 5¢ per Mcf to 152,337 Mcf and 7½¢ per Mcf to 42,633 Mcf daily received in exchange with Texas Eastern Transmission Company (called Texas Eastern) on a "rolled in" rate of 6.5¢ per Mcf, and from which it arrived at a "difference from actual billing" of $688,789.81, which United proposed to pay to Mississippi, as a proper adjustment under the terms of the contract and schedules on file with the Commission heretofore referred to and delineated.

In response to this proposal, the Commission, on May 11, 1951, informed United that the rate of 7½¢ per Mcf applied only to "surplus gas purchased in the Carthage Field" and that the attempt to treat that rate as applicable to gas exchanged with Texas Eastern was "evidently improper and inconsistent with the clear wording of Supplement No. 1 to Supplement No. 15"; and United was requested to file an adjustment consistent with said Supplement No. 1, which meant that the price or rate for all gas should not exceed 5¢ per Mcf.

Thereafter, on June 18, 1951, United submitted "Exhibit A revised" setting out the method of calculation of said adjustment and the amount due thereunder. It then explained at length that "while the monetary results are the same * * *, the method of calculation of the 'Rolled In' price has been changed to give effect to the net gas received for the benefit of" Mississippi; that at the hearing to obtain the necessary certificate for "the looping of the line * * * to supply the additional requirements of Mississippi * * * United's testimony was all directed" to the idea "that the additional gas would come from the Carthage Field" as "surplus gas * * * at an original price of 7.5 cents per Mcf for the first five year period"; that United had made every effort to obtain the surplus gas in the Carthage Field, but "various developments influenced" its decision "to temporarily abandon" these efforts. It described those developments as (1) considerable quantities of gas became available from Texas Eastern at the same price of 7½¢ per Mcf (the source not stated) as surplus gas from other producers; (2) producers insisted United obligate itself to take the full amount of their (producers') allowable less the quantity being taken by other pipe line companies, "a condition under which United could not operate"; and (3) it became apparent that Texas Eastern would have surplus gas during the summer months of 1950. United added that rather than cause hardship to domestic consumers in St. Louis, it made an exchange agreement with Texas Eastern on April 24, 1950 (Rate Schedule No. 109) by which the latter agreed to deliver to United gas in its Carthage-Sterlington line at Castor, Louisiana; and that Texas Eastern charged United for all gas so delivered at the rate of 7½ cents per Mcf by deducting said amount from the

bill for deliveries by United to Texas Eastern at Longview for the same rate under a contract between the parties dated June 20, 1947. It further explained that the gas so purchased or exchanged with Texas Eastern at 7½¢ per Mcf had been "rolled in" with the 5¢ price in the same manner as was done to obtain the 6.5¢ commodity charge provided in Supplement No. 15. It therefore requested that the Commission reconsider its decision and render its findings in favor of United's position. In the same communication United further admitted:

"The entries on United books as far as the adjustment to the Mississippi River Fuel account are concerned show an amount of $1,033,-184.75 as compared to the more realistic figure presented on the attached tabulation of $688,789.81. It has always been the policy of the Company in such matters as this and other items such as tax matters to set up correctly the maximum possible obligation it may be faced with, this being no more than a prudent method of operating."

This was followed by certain arguments as to why it was entitled to equitable relief, including the assertion that "Mississippi * * * has said that it does not want this refund for the very simple reason that it will make United an unwilling supplier." It closed with the statement that the rate charged Mississippi for the gas was 6.5¢ per Mcf.

On July 12, 1951, this revised proposal was likewise turned down by the Commission for the same reasons as the first, that is, it was "inconsistent with the aforesaid Supplement" requiring the additional gas be *purchased in the Carthage Field* and could not be supplied at that rate for gas exchanged with Texas Eastern, but that the settlement should be on the same basis as that of February 28, 1950.

Thereafter United on October 3, 1951, filed with the Commission (Docket No. G-1804) a petition for an order declaring it was *not due any adjustment at all* to Mississippi but was entitled to a refund of the $201,893 paid for the first three months ending February 28, 1950. On October 30th the Commission dismissed this proceeding and United petitioned this Court for review. The Commission moved to dismiss that petition on the ground that under Sub-section (C) of Section 1.7 of the "General Rules and Regulations of the Commission", granting of such declaratory relief was discretionary and its refusal was not dispositive of any right of petitioner. We sustained the motion and dismissed the petition. United Gas Pipe Line Co. v. Federal Power Commission, 5 Cir., 203 F.2d 78.

As stated earlier, Mississippi had been allowed to intervene in February, 1952, in the proceeding before the Commission and on December 5, 1952, the Commission's order, Docket No. 2097, was entered and consolidated with No. 2024.

Before the hearing set for January 26, 1953, United on January 15, 1953, filed the required affidavit stating that the only purchase of gas in the Carthage Field during the two annual periods ending February 29, 1952, was from Stanolind Oil and Gas Company, consisting of 3,558,406 Mcf for a total price of $266,880 at an average rate per Mcf of 7½¢, attaching its statement showing the prices paid for all gas. On January 24, 1953, United filed its motion to dismiss both proceedings (Nos. 2024 and 2097) for the same reasons previously stated as to No. 2024 and on the further ground they did not conform to the Administrative Procedure Act and the Commission was without authority and jurisdiction to conduct the investigation which was patently for the purpose of establishing rates retroactively or amending the same, all in violation of the statute. The motion was denied.

An examiner was appointed and conducted a hearing for several days and finally on September 30, 1953, rendered an intermediate report that United was entitled to charge only the 5¢ per Mcf rate since no "surplus" had been purchased for filling the contract with Mississippi in the Carthage Field. This

ruling was affirmed by a majority of the Commission, two members dissenting.

At the hearing, United having taken the position that the Commission had no jurisdiction for the reasons stated, it stood on that defense and offered no evidence other than the information which it was required to produce by the Commission.

United makes some eight specifications of error: (1) that the Commission's holding that the reasonableness of rates was not before it for decision; (2) that it adjudicated the matter without employing the standards of Sections 4 and 5 of the Act; (3) that it failed to hold the 6.5¢ Mcf rate filed and approved by the Commission was the only lawful rate which United could collect until it had been changed by a proper proceeding under said Sections 4 and 5 of the Act; (4) that the Commission's conclusion and order amounted to a retroactive change of rates and reparation, a power "admittedly" beyond its jurisdiction; (5) that it erroneously held Supplement No. 1 to Supplement No. 15 constituted a "formula" rate; (6) that it was error to hold that Supplement No. 1 to Supplement No. 15 required United as of March 1st of each year to make accountings to the extent that it did not purchase 132,-000 Mcf per day of Mississippi's increased requirements as surplus gas in the Carthage Field; (7) that it erred in holding that Supplement No. 1 to Supplement No. 15 could be given effect as a "Purchased Gas Cost" adjustment or as a "non-purchase of gas adjustment"; and (8) erred in holding that United's published rate schedules could be amended, enlarged, clarified or supplemented, or that said omissions and deficiencies could be supplied by estoppel or waived by the conduct of United.

Counsel for the Commission contends (1) that its findings and conclusions "as to import and meaning of United's filed rate schedules" are supported by substantial evidence; (2) the Commission's interpretation thereof is "in accordance with * * * principles of tariff and rate schedule construction"; and (3) said interpretation "does not involve retroactive rate making or reparations."

There is little dispute as to the facts and the questions involved are: (1) did the contracts and amendments thereof filed with the Commission by United constitute rate schedules applicable alone to Carthage surplus gas, or could it use the 7½¢ per Mcf regardless of whether it was "surplus" from the Carthage Field; and (2) whether acquisition of gas by exchange with Texas Eastern was the same thing as purchasing it from producers, where the basis of the exchange between United and Texas Eastern was a contract made in 1947.

We agree with the Commission that the case does not involve, as such, a matter of fixing the rates to be charged between United and Mississippi. The fixing of rates, of course, is one of the functions of the Commission, to be performed in accordance with the provisions of the Act; but the case presents the question of whether what was actually done complied with previously filed rates. Like all other common carriers, pipe line companies are allowed to file their rates, with the consent of the Commission, which become operative until the Commission either on its own initiative or at the instance of interested parties determines to investigate. If an investigation is ordered, newly filed rates can only apply to the future. Only in this way, after prescribed hearings, can previously filed rates be changed or set aside. Section 717c of the Act. Mississippi Power & Light Co. v. Memphis Natural Gas Co., 5 Cir., 162 F.2d 388.

In presenting its rates to the Commission United stated to some extent the factors of enlarging its line, etc., and the prices it would have to pay for the gas; and on that basis it was allowed to file the contract and supplements disclosing the necessity for paying 7.5¢ per Mcf to obtain the additional 122,000 Mcf from surplus gas in the Carthage Field. Both Mississippi and the Commission were justified in assuming there-

fore that these expenditures would be actually made, and this assumption was further strengthened when United made its first return or report of the amount to be paid for the period ending February 28, 1950. It used the old rate of 5¢ per Mcf applicable to the 73,000 Mcf under the contract before its amendment, and remitted to Mississippi the aforesaid sum of $201,892 for the express reason it had not purchased any surplus Carthage gas at the rate of 7.5¢. This report was approved by the Commission and the amount paid over to Mississippi.

However, in accounting as required by the order of the Commission allowing the filing of Supplement No. 1 to Supplement No. 15 for the next annual period ending March 1, 1951, for the first time it used the rate of 7.5¢ per Mcf as having been paid for the quantity acquired from Texas Eastern. At the same time it disclosed that this rate was based upon a prior agreement made with Texas Eastern in 1947 to exchange gas at that figure and that it had supplied the additional quantities to Mississippi from that source. It claimed, in effect, that the result under the contract and rates filed was the same as if the gas had been purchased for that price as surplus from the Carthage Field.

The record does not support this contention. In filing the original contract and supplements thereto, United represented to the Commission that it would have to obtain the additional 122,000 Mcf as surplus from the Carthage Field at a price of 7.5¢. The Commission presumably relied upon this representation; otherwise, it would have ordered an investigation before allowing the rates to become effective, and it could have rejected them if found excessive under the circumstances. When it later developed that United was supplying the gas through exchange with Texas Eastern, there was nothing from which the Commission could, without a hearing, inform itself of the actual cost to United of the gas being furnished to Mississippi. Further, it appears that the gas United got from Texas Eastern was received at Castor, a considerable distance inside Louisiana from Carthage, and that United was repaying this gas to Texas Eastern in kind at Longview. Hence, there was the distinct possibility that United was saving considerable transportation expense and might devote part of its enlarged line to the supplying of customers other than Mississippi. In addition, there is the possibility that United might have been exchanging to Texas Eastern gas for which it had paid or was paying much less than 7½¢, thereby deriving a decided advantage over the rate it expected to pay for surplus gas in the Carthage Field. As a matter of fact, in complying with the Commission's order to furnish information, United disclosed some factors which apparently operated to its advantage. These considerations were left to conjecture when United failed to produce evidence beyond that specifically required by the Commission.

On the other hand, United could easily have avoided any such loss as it now alleges by disclosing this deviation from the terms of its recorded schedules in an amendment filed for the purpose of having the Commission approve the exchange. This it did not do, and its adjustments were the first indication the Commission had that it was not conforming to the recorded procedure. To allow it to pursue the course followed here would have the effect of permitting United to change its own scheduled rates, a power conferred upon the Commission by statute.

■ Although the determination of rates is a legislative function, it may here be conceded, as United argues, that the statute and equity require the rates to be reasonable and that any possible confiscation may be prevented in a proper jurisdictional case by a writ of injunction issued by a three-judge statutory court. However, that limitation applies to the rate-making power as such and not to the interpretation of an agreement voluntarily made and obligations expressly assumed thereunder. The very nature of this undertaking was such that

there could be variations in the quantities of gas supplied and corresponding variations in United's cost. In view of the uncertainties, we can see no reason why the parties should not have agreed, with the Commission's approval, to adjust these matters in the manner provided by the contracts and schedules filed with and approved by the Commission. What the Commission did here was not retroactive rate-making but enforcement of the contract and United's own rate schedule filed with the Commission.

By application of the contract rates, the Commission found that for the entire period involved in this controversy, the sum due from United to Mississippi was $2,836,293.43. United offered no evidence and has directed our attention to nothing which supports a contention that this figure was incorrect. For the reasons stated, the petition to vacate the Commission's order is

Denied.