**MURPHY OIL CORPORATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 19597.

United States Court of Appeals,
Eighth Circuit.

Sept. 23, 1970.

J. Evans Attwell, Houston, Tex., for petitioner; Lynn R. Coleman and Travis C. Broesche, Houston, Tex., H. Y. Rowe, El Dorado, Ark., and Vinson, Elkins, Searls & Connally, Houston, Tex., on the brief.

David F. Stover, Atty., Federal Power Commission, Washington, D. C., for respondent; Richard A. Solomon, Gen. Counsel, and Peter H. Schiff, Sol., on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

Murphy Oil Corporation and Mississippi River Transmission Corporation are joint owners of oil and gas leases on gas producing acreage in the Barksdale Air Force Base, Bossier Parish, Louisiana.[1] By a contract dated October 15, 1951, Murphy and Mississippi entered into a gas purchase agreement whereby Murphy agreed to sell its gas produced from said field to Mississippi. The Supreme Court in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), determined that gas producers were subject to regulation by the Federal Power Commission under the provisions of the Natural Gas Act, 52 Stat. 821, as amended, 15 U.S.C. § 717 et seq., and, in compliance therewith, Murphy filed the aforementioned contract as a rate schedule.

The contract provided for a base price with periodic increases, plus reimbursement for any existing taxes, and also provided for reimbursement to the extent of two-thirds of any additional taxes.[2] Thereafter, supplements were peri-

---

1. The contract here involved was originally between Murphy Oil Corporation (formerly Murphy Corporation) and Mississippi River Fuel Corporation, but was subsequently assigned by Mississippi River Fuel to its subsidiary, Mississippi River Transmission Corporation, both of which will be referred to herein as "Mississippi."

2. "ARTICLE VIII.

\* \* \* \* \*

"2. In addition to the price as set forth above, Buyer agrees to pay to Seller for each 1,000 cubic feet of gas sold and delivered hereunder, the sum of two and one-half cents (2½¢) for delivering the gas from the well or wells from which it is produced, to a common point convenient to Buyer as provided for in Article VII hereof, for dehydrating said gas in accordance with the specifications contained in Article IV hereof, for compressing said gas to the extent necessary to meet the delivery pressures herein provided for and in reimbursement of any

odically filed effectuating the agreed-upon rate increases. The contract in effect at the time this controversy arose made no mention of any refund, but after a period of time there was a tax refund obtained by Mississippi for Murphy's account, and the disposition of this refund under a summary letter order issued by the Federal Power Commission is the basis of this controversy and concerns the authority of the Commission to control and determine the disposition of the refunded taxes. The order of the Commission stemmed from a proceeding under Section 4 of the Act whereby Murphy had filed for a rate decrease in accordance with an agreement which it had reached with Mississippi.

The issues are whether the Federal Power Commission has jurisdiction over these funds so as to require Murphy to hold them pending its further order as to disposition, and, if so, whether the Commission erred in holding that there was no justification for Murphy to retain any of the amounts without granting it a hearing on the matter.

Murphy timely filed its petition for review of the Commission's order in this court. Jurisdiction is established under the provisions of 15 U.S.C. § 717r(b).

We hold that under certain circumstances the Commission has authority with respect to the disposition of refunds without hearing, but due to the complexity of this case the problem cannot be resolved upon a skeleton record of documentary evidence, in a summary fashion, without an evidentiary hearing. We therefore set aside the Commission's order for the purpose of requiring a plenary hearing for all interested parties to be given the opportunity to offer evidence in order that a determination can be properly made for disposition of the funds involved.

Prior to August 1, 1958, the approved rate for the sale of gas under the Murphy-Mississippi contract was a 10¢ base rate per Mcf plus a 2.5¢ payment, which apparently included a 1¢ gas gathering tax then imposed by the State of Louisiana, making an actual rate of 12.5¢ per Mcf. Effective August 1, 1958 Louisiana, by statute, increased the gas gathering tax from 1¢ to 2¢ per Mcf. Murphy then filed a rate change with the Commission for reimbursement for .667¢ of the additional tax, or a total rate of 13.-167¢. By order issued July 30, 1958 the Commission suspended the proposed .667¢ increase and ordered a hearing but permitted Murphy to collect the increase commencing August 2, 1958, subject to refund "in the event the additional (gas gathering) tax of one cent per Mcf. levied by the State of Louisiana is, for any reason, held to be invalid." Effective December 1, 1958, in accordance with the contract, the base price was escalated .5¢ per Mcf, and accordingly Murphy filed for this increase, making the total rate of 13.667¢ per Mcf. The Commission again permitted the filing, but suspended

existing taxes applicable up to the point of delivery with respect of gas produced, gathered and delivered hereunder.

\*    \*    \*    \*    \*

"ARTICLE IX.
Taxes.

"Seller shall pay or cause to be paid all existing gathering, severance, production and other excise taxes levied on the gas deliverable hereunder up to the point of delivery. Any increase in sales, transactions, occupation, service, production, severance, gathering, transmission, export, or excise taxes, assessments, or fees hereafter levied, assessed, or fixed by the United States or any state or other governmental authority and taxes of a similar nature or equivalent in effect (not includ-

ing income, excess profits, capital stock, franchise, or general property taxes) in addition to or greater than those being levied, assessed, or fixed on the date first above written, if any, in respect of or applicable to the gas to be sold by Seller to Buyer hereunder and which Seller may be liable for during any month, either directly or indirectly, through any obligation to reimburse others are hereinafter collectively referred to as an 'additional tax.' It is expressly understood and agreed between the parties that the Buyer shall pay to the Seller each month, so long as the additional tax shall be in effect, an amount sufficient to reimburse Seller for two-thirds (⅔) of such additional tax. \*  \*  \*"

or deferred the use of the new rate until December 2, 1958, pending a hearing and decision thereon.

Effective December 1, 1958 the General Assembly of Louisiana suspended the gas gathering tax and substituted in lieu thereof a 2¢ per Mcf increase in the existing severance tax. Murphy then filed a rate change with the Commission for reimbursement of two-thirds of the 2¢ additional severance tax (1.33¢), and the Commission permitted this proposed increase to become effective with no mention of suspension or refund.

On May 19, 1959 Murphy and Mississippi executed a letter agreement which they filed with the Commission as a modification of the rate schedule which provided that, "so long as the increased severance taxes are payable on gas delivered under the contract," Mississippi would reimburse Murphy for 1.667¢ of such 2¢ tax, provided that 1¢ would be considered part of the 2.5¢ allowance for gathering, dehydration, compression and "existing taxes," and the remaining .667¢ per Mcf would be considered reimbursement for two-thirds of the "additional tax" of 1¢ as provided for in the contract. The Commission accepted this filing effective as of December 3, 1958 without any provision for suspension or refund, and the Commission expressly terminated the refund obligation heretofore imposed on Murphy's prior filing relating to the gas gathering tax. The order provided that "Murphy's refund obligations contained in its undertaking filed herein are hereby terminated."

On September 18, 1961 Murphy filed a rate increase for another .5¢ escalation in the base price to become effective on December 1, 1961 under the terms of the contract raising the total rate from 13.667¢ to 14.167¢ per Mcf. The Commission accepted this filing and allowed the rate to become effective on December 1, 1961 without a provision for suspension or refund. In its acceptance letter, however, the Commission stated:

"This acceptance for filing does not constitute authorization under Section 7 of the Natural Gas Act; nor shall it be construed as constituting approval of any rate or provisions contained in the rate filing; nor shall such acceptance be deemed as recognition of any claimed contractual right or obligation associated therewith; and such acceptance is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against your company."

On September 1, 1963 Mississippi commenced paying the severance tax under protest, and on November 22, 1963 filed suit against the Collector of Revenue for the State of Louisiana alleging that the tax was void as applied to gas extracted from a federal enclave such as Barksdale Air Force Base. In Mississippi River Fuel Corp. v. Cocreham, 247 F.Supp. 819 (E.D.La.1965), the district court held that Louisiana could impose such a tax under the authority of Mississippi River Fuel Corp. v. Fontenot, 234 F.2d 898 (5th Cir. 1956), but on appeal the Fifth Circuit overruled its decision in *Fontenot* and held that the tax was invalid as to gas produced on the Barksdale Air Force Base lands, which were acquired by the United States with the consent of the Louisiana Legislature, the United States acquiring "exclusive jurisdiction" over the property. Mississippi River Fuel Corp. v. Cocreham, 382 F.2d 929 (5th Cir. 1967), cert. denied, sub nom. Mouton v. Mississippi River Fuel Corp., 390 U.S. 1014, 88 S.Ct. 1264, 20 L.Ed.2d 164 (1968). Thereafter, the State of Louisiana refunded to Mississippi tax payments made since September 1, 1963 when it commenced paying them under protest, together with interest, and Mississippi, in turn, paid Murphy 1.667¢ per Mcf.

Following the denial of certiorari by the Supreme Court in Mouton v. Mississippi River Fuel Corp., *supra*, on April 8, 1968, Murphy and Mississippi agreed that commencing May 1, 1968, the total rate, including tax reimbursement, payable for gas delivered under the contract

would be reduced from 14.667¢ per Mcf to 14¢ per Mcf. This rate was calculated on the basis of 11.5¢ per Mcf plus 2.5¢ for compensation for gathering, dehydration and compression of the gas. On July 29, 1968 Murphy filed this letter agreement with the Commission, and on August 1, 1968 filed a decrease in rate from 14.667¢ per Mcf to 14¢.

By letter order dated August 30, 1968 the Commission notified Murphy that its proposed rate decrease had been accepted for filing and directed Murphy to submit a report to the Commission showing the amount of principal and interest, if any, which it received from the State of Louisiana as a result of the severance tax refunds attributable to the 1.667¢ tax reimbursement previously collected or to be collected by Murphy from Mississippi. The Commission also directed Murphy to retain said amount pending further order of the Commission directing disposition thereof.

On September 16, 1968 Murphy filed an application for rehearing and requested a stay of the portion of the Commission's letter order pertaining to retaining and reporting refunded taxes and interest. Murphy asserted that the Commission had no jurisdiction over the repaid taxes and interest; that the obligations imposed upon Murphy to retain and report the amounts recovered constituted a "sanction" upon Murphy within the definition and meaning of the Administrative Procedure Act in that Murphy was denied a fair and impartial hearing assured to it by said Act and the "sanction" was imposed upon Murphy by the Commission beyond and outside of the jurisdiction delegated to it by law; that the effect of the order was to deprive Murphy of the use and benefit of such funds as a portion of its corporate assets, and in effect constituted an unlawful retroactive rate order and an award of reparations; and that the Commission had no authority over the refunds for the further reason that Murphy was not subject to any refund obligation whatsoever. On October 15, 1968 the Commission granted the petition for

rehearing "solely for the purpose of allowing * * * an opportunity to give adequate consideration to the matters set forth therein. * * * "

On December 2, 1968 the Commission issued its order on rehearing modifying its previous order of August 30, 1968. It held that the judicial determination that the State of Louisiana may not levy a severance tax on gas produced from federal lands at Barksdale Air Force Base eliminated any contractual basis for Murphy to collect reimbursement relating to such severance tax. The Commission amended its earlier order, however, to require a refund report by Murphy only with respect to .667¢ per Mcf, rather than the 1.667¢ as originally ordered, holding that the remaining .667¢ tax reimbursement is independent of the omnibus clause of the contract and that its collection clearly depends upon payments of the severance tax.

The Commission gave as its reason for not allowing a hearing on the matter that there was no factual dispute involved, that the only question raised by Murphy appeared to be legal issues, and that under those circumstances there was no necessity for a hearing. The Commission stated that the order did not constitute a reparations award in any sense since it did not involve any determination as to the justness and reasonableness of the rates, but that the basis of the refund requirement was a contractual one. It held that since Murphy was not required to pay the severance tax it followed that it was not entitled to reimbursement therefor; that as a matter of law Murphy was not allowed to charge any rate in excess of its contractually authorized rate of 11.5¢ base rate plus 2.5¢ handling charges which included a 1¢ allowance for severance tax reimbursement; and that under the circumstances the Commission had authority to require refunds. The Commission then granted the petition for rehearing only to the extent of the matters set forth therein. It modified the August 30, 1968 order to require Murphy to retain only those refunds received from the State of Louisiana at-

## 810

tributable to the .667¢ tax reimbursement collected by Murphy under its FPC Gas Rate Schedule No. 6, including any interest received thereon, pending further Commission order.

The Commission contends that Murphy's assignments of error are deficient in that no issue of fact was raised. Murphy's specifications of error were much more comprehensive than the one-page order itself and included a preliminary statement of fact in order that its specifications of error would be meaningful in light of the fact that no hearing records existed. Included in its specifications, it sets out its objection to the jurisdiction of the Commission over the proceeds involved, the lack of authority of the Commission, the fact that the one-page letter order constitutes a sanction within the definition and meaning of the Administrative Procedure Act and, further, that Murphy was denied a fair and impartial hearing required by said Act and that the letter order constituted an unlawful order of reparation. In order for Murphy to have been more specific, it would have had to have been able to read the Commission's mind because the letter order did not give any reason whatsoever underlining any basis for the order and consequently Murphy could not have anticipated the Commission's rationale. We hold that the assignments of error were sufficiently specific and that the Commission's contention to the contrary is without merit.

*Authority of the Commission to Order Refunds.*

■ Although the Commission did not mention it in its order or rehearing order, it now takes the position that it had authority to order refunds in the instant case based upon § 16 of the Natural Gas Act, 15 U.S.C. § 717*o*, which authorizes the Commission to "issue * * * such

order * * * as it may find necessary or appropriate to carry out the provisions of this Act." In certain situations, such as the one in Mississippi River Fuel Corp. v. Federal Power Commission, 108 U.S.App.D.C. 284, 281 F.2d 919 (1960), hereafter discussed, the Commission can utilize § 16 authority to effectuate its orders lawfully entered, but § 16 is not an enlargement of the specific authority granted the Commission under §§ 4, 5 and 7 of the Act.

■ It has long been settled that the Commission's rate powers under the Act are quasi-legislative and not quasi-judicial. Hope Natural Gas Co. v. Federal Power Commission, 134 F.2d 287 (4th Cir. 1943), rev'd on other grounds, Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).[3] Also, § 5 makes it clear that a change in rate applies prospectively only.

■ The Commission's authority is, of course, limited to that granted by the Congress in the Act. We said in Montana-Dakota Utilities Co v. Federal Power Commission, 169 F.2d 392, 397 (8th Cir. 1948), cert. denied, 335 U.S. 853, 69 S.Ct. 82, 93 L.Ed. 401 (1948):

"It is true that the powers of an administrative agency created by Congress to carry on governmental activities are circumscribed by the authority granted in the Act or Acts of Congress pertaining thereto. (Citing cases.)"

The authority of the Commission to review rates is set forth in §§ 4 and 5 of the Act. Section 4(e) provides that when a new schedule is filed with the Commission it has the authority to act thereon "but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate * * *" and to suspend rates and make orders "after

---

3. In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944), the Supreme Court said:

"It is conceded that under the Act the Commission has no power to make repara-

tion orders. And its power to fix rates admittedly is limited to those 'to be thereafter observed and in force.'"

full hearings." [4] Section 5 of the Act furnishes the authorization to the Commission to investigate existing rates and *after a hearing*, if the rates are found to be unjust, unreasonable, unduly discriminatory, or preferential, to determine and fix the just and reasonable rates to be thereafter observed and in force. Section 7 provides for the procurement of certificates of public convenience and necessity and authorizes the Commission, *after notice and opportunity for a hearing*, to impose certain conditions consistent with the public interest.

The Commission has skirted these sections granting specific authority, each of which requires a hearing, and would justify its no-hearing order in the instant case under § 16 of the Act which merely empowers the Commission to perform any and all acts necessary or appropriate to carry out the provisions of the Act.[5] This section of the statute simply does not authorize the Commission to enter an order such as was done here without extending a right of hearing to the parties.

The Commission primarily bases *its* authority for requiring refunds in this case on Pan American Petroleum Corp. v. Kansas-Nebraska Natural Gas Co., 297 F.2d 561 (8th Cir. 1962), cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962), and related decisions invalidating state minimum price orders. There are a number of reasons why *Pan American* cannot be analogized with the instant case. When the state minimum price was enacted, the pipeline company notified the producer that the payments made in compliance with such orders would be under protest and involuntary, without prejudice. Additionally, each of the checks of the pipeline company made in payment to the producer was conditional and made under protest. Subsequently, when the Supreme Court declared that state minimum price order invalid, the pipeline sought payment which the producer refused. The pipeline then brought suit in the federal district court, and this court held that the question of refunds was a common-law claim arising out of the contract between the parties and that the Commission's jurisdiction under the Natural Gas Act was unrelated to such claim unless there had been a finding that the rates were unlawful as being unjust and unreasonable.

The other cases cited by the Commission in its rehearing order are readily distinguishable from the case at bar.

4. The Commission may suspend the operation of a rate schedule for as long as five months but if the application for a change in rate has not been acted upon by the Commission within that period the proposed change in rate will go into effect on motion of the natural gas company making the filing. In such event, the Commission may order the company to furnish a bond to refund any amounts ordered by the Commission as a result of disapproval or modification of the rate schedule.

5. Section 16 of the Act is 52 Stat. 830, 15 U.S.C. § 717o, and provides as follows: "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours."

United Gas Pipe Line Co. v. Mobil Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), involved a unilateral filing of a rate increase by the producer, and the Court there held:

"For the reasons discussed below, we hold that the Natural Gas Act does not give natural gas companies the right to change their rate contracts by their own unilateral action." 350 U.S. at 337, 76 S.Ct. at 377.

In the instant case, there is no attempt at unilateral rate change and Murphy's rate filings had long ago been accepted.

Another case cited is United Gas Pipe Line Co. v. Federal Power Commission, 220 F.2d 706 (5th Cir. 1955). In that case the proceeding before the Commission originated by a petition for relief seeking an accounting in compliance with the rates filed with the Commission. The Commission made an investigation to enable it to make a determination and an examiner was appointed who conducted a hearing of several days. The Commission as well as the purchaser of the gas had every right to assume that United would make the expenditures necessary to obtain surplus gas from the Carthage Field, but such gas was not purchased and United attempted to apply the rate to gas exchanged in lieu of gas purchased from the Carthage Field. Not only was a hearing held but United was afforded the opportunity to introduce evidence which it failed to do other than furnishing the information required by the Commission. This was a matter of the pipeline company charging a higher rate than it had a right to do under the filed rates, and upon being afforded the opportunity to offer evidence in justification declined to do so.

Mississippi River Fuel Corp. v. Federal Power Commission, *supra*, is also patently distinguishable as a settlement agreement was involved there which expressly provided for refunds and also refunds had already been ordered in a § 4(e) proceeding. What the Commission did in *Mississippi River Fuel Corp.* was only to compute and fix the precise amount of refund. In the instant case, of course, there was no agreement for refund.

In Skelly Oil Co. v. Federal Power Commission, 401 F.2d 726 (10th Cir. 1968), there was involved the Commission's certification powers under § 7. The Commission issued a permanent certificate but modified its original order on rehearing to provide for a lower price and to require refunds of amounts collected in excess of such lower price. Unlike *Skelly*, there is no contention in the instant case that Murphy's rates are excessive or that Murphy was ever put on notice that its rates were subject to revision, and its orders permitting Murphy's rates to become effective had long been final.

*Necessity for a Hearing.*

Under the circumstances of this case the contract is, to say the least, ambiguous. No refund of taxes was provided for in the contract and probably none was contemplated, and even the intent of the parties was not clear insofar as the original contract related to the tax aspect of the rate. On May 19, 1959 Mississippi wrote Murphy to the effect that the application of the contract was not entirely clear by reason of the actions of the Louisiana Legislature.[6]

6. An excerpt from the letter reads as follows:
"The application of the contractual provisions regarding tax reimbursement of the changed tax structure resulting from the adoption of Acts 2 and 3 of the First Extraordinary Session of the 1958 Legislature is not entirely clear. The parties, at the time of execution of the contract, did not contemplate the possibility of repeal or suspension of the then existing gas gathering tax and accordingly made no explicit provision covering the eventuality which has now occurred. However, since it is apparent that the increase in the severance tax was intended by the Louisiana Legislature to be a substitute for the gathering taxes which had come under attack on constitutional grounds in the courts, we believe that it is appropriate and consistent with the intent of the parties as expressed in the contract

The contract being ambiguous, parol evidencce is admissible as to its interpretation and construction, and a trial (or, in this instance, an administrative hearing) on the issues must be had. Elbow Lake Coop. Grain Co. v. Commodity Credit Corp., 251 F.2d 633 (8th Cir. 1958). It was held in Cram v. Sun Ins. Office, Ltd., 375 F.2d 670 (4th Cir. 1967), that intent of the parties to an ambiguous contract is a question of fact which cannot properly be resolved on motions for summary judgment. Mr. Justice Clark in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472–473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), observed that summary procedures should be used sparingly in litigation where motive and intent play leading roles.[7]

The rates in the instant case were by the original contract pegged to the state taxes exacted, and there is no provision relating to any refund. Mississippi made no claim for any refund and by voluntarily remitting Murphy's portion to it construed the contract as if such action were required. It could well be that the parties intended that the amount eventually recovered from the State of Louisiana had no effect on the rate. And, as hereinbefore mentioned, the justness and reasonableness of the rate are not involved in this proceeding. We note from the Appendix that in Murphy's filing with the Commission in its Supplement No. 10 to FPC Gas Rate Schedule No. 7 dated September 18, 1961 it is asserted

that the rate is less than the ceiling price in Northern Louisiana and less than the actual statutory "just and reasonable" price in the consolidated §§ 4(e) and 5(a) proceedings entitled "In the Matter of Murphy Corporation, et al. Docket No. 9548." Of course, if the rates are in fact just and reasonable, the public is not adversely affected. The Commission stated in its rehearing order that "it does not involve any determination as to the justness and reasonableness of Murphy's rate. The basis for the refund requirement is a contractual one."

We think that a hearing is imperative for a proper determination of this case, and that to deny it is to deny petitioner procedural due process. The court said in Shell Oil Co. v. Federal Power Commission, 334 F.2d 1002, 1012 (3rd Cir. 1964):

"The parties to a proceeding before an administrative agency such as the Commission are entitled to: first, due notice as to the nature and scope of the contemplated inquiry; second, an opportunity to be heard and present evidence; and third, a full hearing in conformity with the fundamental concepts of fairness. * * * A departure from these minimal requirements is a denial of procedural due process. * * *"

The Commission's order is set aside and the case is remanded with directions that a plenary hearing be held as set out in this opinion.

---

that you receive reimbursement for the increased severance tax payable in respect of gas delivered under the contract which is equivalent to the reimbursement you were receiving in respect of the gas gathering taxes."

7. The full paragraph containing Mr. Justice Clark's observation is as follows: "It may be that upon all of the evidence a jury would be with the respondents. But we cannot say on this record that 'it is quite clear what the truth is.' Certainly there is no conclusive evidence supporting the respondents' theory. We look at the record on summary judgment in the light most favorable to Poller, the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" (368 U.S. at 472–473, 82 S.Ct. at 491.)