MONTANA–DAKOTA UTILITIES CO. v.
FEDERAL POWER COMMISSION
et al.

No. 13396.

Circuit Court of Appeals. Eighth Circuit.

Aug. 4, 1948.

Writ of Certiorari Denied Oct. 25, 1948.

See 69 S.Ct. 82.

394

Armin M. Johnson, of Minneapolis, Minn (John C. Benson and Faegre & Benson, all of Minneapolis, Minn., on the brief), for petitioner.

Lambert McAllister, Sp. Counsel, Federal Power Commission, of Washington, D. C. (Bradford Ross, Gen. Counsel, Federal Power Commission, of Washington, D. C., and S. W. Jensch, Atty., Federal Power Commission, of St. Paul, Minn., on the brief), for respondent Federal Power Commission.

L. E. Melrin, of Minneapolis, Minn. (Melrin & Nieman, of Minneapolis, Minn., on the brief), for respondent Mondakota Gas Co.

Before THOMAS, JOHNSEN and RIDDICK, Circuit Judges.

THOMAS, Circuit Judge.

Pursuant to the provisions of § 19(b), 15 U.S.C.A. § 717r(b), of the Natural Gas Act of June 21, 1938, the Montana-Dakota Utilities Co. has petitioned this court to review, vacate and set aside two orders of the Federal Power Commission. The first order dated March 22, 1946, requires the petitioner to file, for the common carrier transportation of natural gas in interstate commerce, a new rate schedule reflecting the rates and charges set forth in an exhibit appended to the order. The second order, entered on rehearing and dated January 29, 1947, affirms the first.

Montana-Dakota Utilities Co. organized under the laws of Delaware with its principal place of business at Minneapolis, Minnesota, is a natural gas company within the meaning of the Natural Gas Act, § 2(6), 15 U.S.C.A. § 717a(6), in that it is "engaged in the transportation of natural gas in interstate commerce." As such natural-gas company it has a Certificate of Convenience and Necessity issued by the Federal Power Commission on April 6, 1943.

It owns and operates an integrated interconnected pipeline system located in the states of Montana, North Dakota and South Dakota. Natural gas transported in this system comes from the Bowdoin field in Montana and the Baker field situated partly in Montana and partly in North Dakota. The pipe lines extend from near Malta, Montana, and Williston, North Dakota, on the north to Rapid City in the Black Hills of South Dakota, on the south; and from Miles City, Montana, on the west to Bismarck, North Dakota, on the east. The natural gas transported through its lines is distributed for public consumption to communities in the three states named for industrial, commercial and domestic purposes.

The original complainant, Mondakota Development Company, was a Montana corporation owning leases and operating agreements covering approximately 40,000 acres of oil and gas lands in the Baker and Bowdoin fields. Its successor, Mondakota Gas Company, was organized under the laws of Nevada in 1942 and took over and acquired all of the assets of the Development Company.

Among the assets acquired by the Gas Company from Mondakato Development Company are two producing wells known as the Becker Wells. One of these wells is on state school land and the other on privately owned fee land, five and seven miles, respectively, distant from petitioner's Little Beaver compressor station in the Baker gas field. These wells have never been connected with any pipe line but since their completion have been shut in and have produced no gas.

With the exception of petitioner's pipe line extending in an easterly direction from its Cabin Creek compressor station in Montana to Bismarck, North Dakota, the pipe lines involved in this case were constructed in part upon rights-of-way across government-owned lands under permits granted by the Secretary of the Interior pursuant to the provisions of the Leasing Act of February 25, 1920, as amended by the Act of August 21, 1935, 41 Stat. 437, 449,

§ 28 et seq., 49 Stat. 678, 30 U.S.C.A. § 185 et seq., and regulations thereunder.

Pursuant to certain provisions of the Leasing Act, supra, the Secretary of the Interior approved unit plan agreements covering the production and marketing of natural gas in both the Bowdoin and Baker fields in which petitioner was designated the "Unit Operator." All the natural gas transported over its pipe lines is either produced by the petitioner or purchased by it from others under these agreements.

By the terms of the unit plan agreements the petitioner is given certain exclusive rights relating to prospecting for, producing and disposing of the natural gas from the lands described in the agreements. The Commission found that as a result of the operation of such unit plan and its own production from wells in these fields the petitioner acquired and exercises complete control of the production, transportation and sale of all gas produced from both fields and that it provides the exclusive market for such gas.

Gas produced on government-owned lands is transported through all parts of its system of lines. Petitioner has never transported any natural gas for others; nor does it sell natural gas at wholesale for resale to any gas distributing company.

This proceeding was instituted when the Mondakota Development Company filed its complaint against the petitioner herein on December 6, 1941. Thereafter, its successor, Mondakota Gas Company, was substituted as party complainant.

The original complaint alleged that the rates and charges specified in schedules filed with the Commission by the petitioner, as common carrier for the transportation of natural gas in interstate commerce, were excessive, unreasonable and discriminatory, and asked that the Commission fix fair, reasonable and non-discriminatory rates for such services.

In its answer the petitioner denied that it had any rates for the transportation of natural gas and alleged that the complainant had not tendered any gas to it for shipment and never had any gas to ship.

On its own motion the Commission commenced a separate proceeding on July 7, 1942, by an order instituting an investigation to determine whether petitioner is a natural gas company within the meaning of the Natural Gas Act and "whether in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, any rates, charges or classifications demanded, observed, charged or collected, or any rules, regulations, practices, or contracts affecting such rates, charges, or classifications, are unjust, unreasonable, unduly discriminatory or preferential"; and, if found to be so, to fix just and reasonable rates.

The orders complained of were entered in a consolidation of these two proceedings for purposes of hearing before the Commission.

Long prior to the commencement of these proceedings, in October, 1933, the petitioner had filed in the Department of the Interior a rate schedule for the interstate transportation of natural gas through that part of its pipe line extending from its Baker Compressor Station in Montana south to Rapid City, South Dakota. A second schedule of rates for the same line was filed in 1936; and on August 24, 1938, both these schedules were filed with the Federal Power Commission. These are the schedules assailed in the complaint as unreasonable and discriminatory. Further facts relating to them will be set out in connection with the discussion of the points relied upon by the petitioner.

The petitioner contends: 1. That the orders under review are invalid and void because the Federal Power Commission is without power or jurisdiction to determine the issues presented; and 2. That the rates prescribed by the Commission's order of March 22, 1946, and affirmed on rehearing, are arbitrary, inadequate and confiscatory.

Since petitioner's first contention, urged here persuasively and emphatically, is that the Federal Power Commission is without power to determine the issues presented it will be conducive to clarity and brevity alike to inquire what are the Commission's powers applicable to the issues decided and now to be reviewed.

Section 1 of the Natural Gas Act, supra, 15 U.S.C.A. 717, provides:

"(a) * * * it is hereby declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

"(b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce * * * and to natural-gas companies engaged in such transportation * * *."

Sections 4(c) and 5(a), 15 U.S.C.A. §§ 717c(c) and 717d(a), of the Natural Gas Act, copied in the margin,[1] define the Commission's general powers.

Petitioner first urges that, even though it be a natural-gas company within the meaning of the Act, it is not a common carrier of natural gas unless it be as a common law common carrier; that it is only a public utility company transporting natural gas in interstate commerce to supply its own customers; and that it discharges its common carrier duty by purchasing natural gas under the unit plan. We think it is a statutory common carrier obligated to the public pursuant to its commitments under the Leasing Act, supra. Except the extension to Bismarck, North Dakota, all of petitioner's pipe lines traverse government owned lands under permits issued by the Secretary of the Interior pursuant to the Leasing Act and regulations thereunder.

Section 28 of the Leasing Act, 30 U.S. C.A. § 185, provides that "Rights-of-way through the public lands * * * may be granted by the Secretary of the Interior for pipe line purposes for the transportation of oil or natural gas to any applicant possessing the qualifications provided in section 181 of this title, to the extent of the ground occupied by the said pipe line and twenty-five feet on each side of the same under such regulations and conditions as to survey, location, application, and use as may be prescribed by the Secretary of the Interior and upon the express condition that such pipe lines shall be constructed, operated, and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas produced from Government lands in the vicinity of the pipe line * * *."

The understanding of petitioner and of the Secretary of the Interior as to the meaning of § 28 of the Leasing Act, supra, is clearly shown by a stipulation entered into on December 17, 1934, in connection with petitioner's application for right-of-way permits for gas pipe lines over public lands in Montana, North Dakota and South Dakota wherein applicant "expressly consents and agrees that its pipe line shall be constructed, operated, and maintained as a com-

---

[1] Section 4(c) "Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from the date this act takes effect) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."

Section 5(a) "Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State Commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract, affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Provided, however, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural-gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

mon carrier and that the use of the pipe line for the transportation of oil or gas shall be limited to oil or gas produced in conformity with State and/or Federal laws * * * and further expressly consents and agrees to purchase and/or transport oil or gas available on Government lands in the vicinity of its pipe line or gathering branches without discrimination as between Government lands and lands of others and in such ratable proportions as may be satisfactory to the Secretary of the Interior."

█ It is too clear for argument that the petitioner, having applied for and accepted a permit to do so and having constructed its pipe line over the public lands, became and is a statutory common carrier of natural gas and that its, rates and schedules are subject to the jurisdiction of the Federal Power Commission under the Natural Gas Act. To hold otherwise would negative the purposes of Congress as expressed in both the Leasing and the Natural Gas Acts. That petitioner prefers not to assume the burdens of a common carrier for the transportation of natural gas in interstate commerce through its pipe lines is immaterial. United States v. Ohio Oil Co., 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459.

The petitioner next argues that the Commission's only power is to revise the existing rates of a natural-gas company; that since it had no rates in existence at the beginning of these proceedings or at any time thereafter, the orders under review, therefore, are invalid and void.

█ It is true that the powers of an administrative agency created by Congress to carry on governmental activities are circumscribed by the authority granted in the Act or Acts of Congress pertaining thereto. Stark v. Wickard, 321 U.S. 288, 309, 64 S.Ct. 559, 88 L.Ed. 733; Marbury v. Madison, 1 Cranch, 137, 165, 2 L.Ed. 60; Morgan v. United States, 298 U.S. 468, 479, 56 S.Ct. 906, 80 L.Ed. 1288.

Section 5(a), 15 U.S.C.A. § 717d(a), of the Natural Gas Act provides that "Whenever the Commission, after a hearing had upon its own motion or upon complaint * * * shall find that any rate * * * demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission * * * is unjust, unreasonable, etc. * * * the Commission shall determine the just and reasonable rate * * *."

The question of fact, therefore, whether the petitioner did have a schedule of rates in existence is of importance. It is conceded that pursuant to the provisions of the Natural Gas Act and the Commission's Order No. 53, the petitioner on August 24, 1938, filed with the Commission the two rate schedules referred to above previously filed with the Secretary of the Interior which were designated in the Commission's files as "Montana-Dakota Utilities Co. Rate Schedules F. P. C. Nos. 3-G and 4-G." Upon the evidence submitted, including its own records, the Commission found:

"(10) Montana-Dakota Utilities Co. Rate Schedules F. P. C. Nos. 3-G and 4-G since the date of filing have remained continuously on file· with the Commission as Respondent's demanded rates for the common carrier transportation service therein specified. Such rate schedules have not been amended, altered, changed or cancelled."

The only means of altering, changing or cancelling a filed rate schedule is provided by the Provisional Rules of Practice and Regulations under the Natural Gas Act promulgated by the Commission and of which the Commission found that petitioner had actual notice. Section 54.5 of Part 54 of such rules provides that when a rate schedule on file with the Commission is proposed to be cancelled a formal notice shall be served upon the Commission to that effect and posted for 30 days, after which the Commission may permit the notice of cancellation to be filed with the proposed effective date thereof. The procedure so required was not complied with. Notwithstanding such failure, in order to show that it had no rate schedules on file with the Commission, petitioner relies upon correspondence with the Chief of the Rate Section of the Commission. On January 16 and February 8, 1940, Petitioner's treasurer wrote saying that its rate schedules 3-G and 4-G had not been used and that it, therefore, wished to withdraw them from the Commission's "rate file."

On February 20, 1940, the Commission's secretary replied saying, "Your Rate Schedules FPC Nos. 1-G, 3-G, and 4-G have been removed from the active files of the Commission."

As heretofore stated, on December 6, 1941, the original complaint was filed in this proceeding. On July 7, 1942, the Commission's Order Instituting Investigation was entered. Thereafter, on July 13, 1942, a letter for the Commission signed by its secretary was sent to the petitioner reading:

"In your letters of January 16, 1940, and February 8, 1940, you informed the Commission that no service had been rendered under either of the rate schedules [3-G and 4-G] and stated that you wished to withdraw them. In a letter of February 20, 1940, you were informed that the rate schedules were 'removed from the active files of the Commission.'

"It now appears that the rates and services provided by the two rate schedules are still your 'demanded' rates for the transportation of natural gas. Therefore, these rate schedules are being reinserted in the Commission's active rate schedule files."

■ The question presented to this court is whether the findings of the Commission, supra, that the rate schedules filed by petitioner with the Commission on August 24, 1938, "have not been * * * canceled" is supported by substantial evidence. Section 19(b), 15 U.S.C.A. § 717r(b), provides that upon review "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." The findings of an administrative agency are not to be tested by Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525. The petitioner did not cancel the filed rate schedules in the way provided by the regulations; and literally speaking it did not succeed in "withdrawing" them from the files of the Commission. Technically, therefore, the finding is correct. Under these circumstances we are bound by the finding of the Commission; and we cannot hold that the Commission for this reason alone exceeded its power in investigating and revising the rate schedules filed by petitioner.

In this connection petitioner argues that, conceding arguendo that it is a statutory common carrier of natural gas and subject to the jurisdiction of the Commission, it is not required in any event to fix rates prior to the time full information concerning the desired shipment has been furnished to it.

This contention ignores the provisions of the Natural Gas Act, § 4(c) of which provides that "Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from the date this chapter takes effect) and in such form as the Commission may designate * * * schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission * * *."

■ After the effective date of the statute, by its Order No. 53 of July 5, 1938, the Commission provided that all schedules covering deliveries of natural gas in the states of Montana, North Dakota, South Dakota, and certain other states should be on file not later than August 22, 1938; and by Part 54 of its Provisional Rules of Practice and Regulations, Order 52, it specified the form in which such schedules should be filed. Pursuant to the statute and in compliance with these regulations petitioner filed rate schedules 3-G and 4-G referred to above. It cannot now add to or subtract from the provisions of the statute nor rely upon its own failure to comply with the prescribed requirements of Congress.

■ The further argument on this point that the Mondakota Gas Company is not a competent party complainant for the reason that it is not presently a gas distributing company is without merit in view of the finding of the Commission that it has gas for sale as well as potential customers whenever it can obtain reasonable rates of transportation. Further, whether or not the gas company is a competent complainant is immaterial in view of the fact that pursuant to its statutory power the Commission initiated the investigation in which the orders complained of were issued.

Again, the petitioner insists that the orders complained of are invalid and void for the reason that whereas the rate sched-

ules, 3-G and 4-G on file with the Commission, applied only to the pipe line running south from the Baker Compressor in Montana to Rapid City, South Dakota, called the Black Hills line, the rates prescribed in the orders apply to petitioner's entire Bowdoin-Baker system of lines including the line from its Cabin Creek Compressor station in Montana to Bismarck, North Dakota, which line does not traverse any public lands.

This contention requires a consideration of the conditions confronting the Commission when it undertook to exercise the rate-making power imposed upon it by law. The Commission found, and its finding is supported by substantial evidence in the record, that the petitioner owns and operates an integrated interconnected natural gas pipe line system, with appurtenant facilities, through which it transports in interstate commerce natural gas produced in Montana and North Dakota to markets in both these states and in South Dakota. Gas moves north in this system from the Baker field over lines terminating at Miles City, Montana, and Williston, North Dakota, and also, over the line terminating at Bismarck, North Dakota. Sometimes gas moves from the Bowdoin field to all these markets except the markets in South Dakota. The petitioner is a shipper to all such markets as well as a carrier. Further, the duties of the petitioner as a common carrier and the regulatory power of the Commission do not end at the boundaries of the public land traversed by the pipe lines. They apply alike to the entire interstate transportation of natural gas over every part of the interconnected pipe line system.

The Commission also found that the rates demanded, Rate Schedules 3-G and 4-G, are unduly discriminatory in that they are greater than the rates charged for gas, (i. e., the cost of the gas plus all transportation costs) delivered to petitioner's own industrial customers, each of whom is served directly from transmission lines.

Under these circumstances no feasible plan is suggested to eliminate discrimination, and it does not appear that any effective regulatory rate order could be entered to achieve that result, without including the entire system. Moreover, section 5(a) of the Natural Gas Act does not prescribe an exclusive means or method to be applied by the Commission for removing a discriminatory rate or practice. On the other hand, section 5(a) of the Natural Gas Act provides that when discrimination is found to exist the Commission "shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be therafter observed and in force, and shall fix the same by order. * * *" We hold that the Commission's powers are adequate under the circumstances shown here to enter its order prescribing a rate schedule for petitioner's entire connected interstate system.

The jurisdiction of the Commission is challenged, finally, on the ground that the proceeding in which the orders were entered is and was at all times moot because (1) the complainant Mondakota Development Company was dissolved prior to the hearing; (2) the substituted complainant, Mondakota Gas Company, is not and never was a natural gas distributing company within the meaning of § 5 of the Natural Gas Act, and consequently was not a qualified complainant; and (3) the gas producing wells of the Mondakota Gas Company are located in territory included in one of the potential unitization plans.

The Commission considered each of these arguments and rejected them. We think it is unnecessary to extend this opinion with a discussion of these contentions because, assuming that one or more of them is meritorious, they do not show that the proceeding is moot. Section 5(a) of the Natural Gas Act provides that a hearing may be had by the Commission upon its own motion and upon a proper finding shall determine the just and reasonable rate, etc. In this instance the Commission did institute an investigation upon its own motion and as a result of that hearing made findings and entered the orders complained of. The whole record here reflects the existence of a dispute and controversy, involving not only factual questions but also questions of law which ought to be determined for the future guidance of the petitioner and of the Commission. Under these cir-

cumstances a proceeding before a government agency is not moot. See Walling v. Haile Gold Mines, Inc., 4 Cir., 136 F.2d 102.

■ To support its second contention, namely, that the rates prescribed by the Commission's order of March 24, 1946, are arbitrary, inadequate and confiscatory, the petitioner argues: 1. The rates make no allowance for the increased facilities or services required to be furnished; 2. The rates would not return the costs upon which they are computed; 3. The allowance for depreciation is inadequate; 4. The order requires petitioner to provide storage in its transmission lines for the natural gas of a shipper; 5. The orders provide for no minimum shipments; 6. They (the orders) require no nominated demand by a shipper; 7. The provisions for "Determination of Billing Demand" will not provide payment by the shipper for his full demand; 8. The provision for consolidation of deliveries in computing billing demand is improper; and 9. The provisions for line loss and variation in heat content are arbitrary and unreasonable.

The rates prescribed in the order complained of were based upon what the Commission found to be the petitioner's cost of rendering service for the years 1942 and 1943 and included depreciation, taxes, a fair proportion of general expense and working capital, plus a return of six per cent on depreciated investment in gas plant.

The petitioner first assails as confiscatory the use of costs for rendering services in 1942 and 1943 as an adequate and proper basis for a rate schedule in later years on the ground that in 1942 and 1943 this petitioner transported natural gas for itself only for delivery to its own customers in the capacity of a public utility and not in the capacity of a common carrier. Its claim is that to transport gas as a common carrier it will be required to add to its present facilities meters at points both of receipt and of delivery and perhaps other facilities, all of which will result in additional costs of service The Commission contends that the prescribed rate is based upon the total cost, as shown by the record, of transporting gas as a common carrier. One witness testified that a latitude for all such extra costs for common carrier services is provided in the cost determinations. A witness for the petitioner took the opposite view.

■ The record does not show that the cost of meters or other facilities or services required under the order for common carrier services would be substantial or that the rule that the rates must be fair and reasonable and not discriminatory would require any increase in the rates prescribed.

Petitioner's second contention, that the rates prescribed would not return the costs upon which they are computed, is based upon an inference drawn from a study made by a rate engineer and introduced in evidence on rehearing as Exhibit 2. Analysis of the exhibit and of the evidence in connection therewith discloses that the inference drawn by counsel for petitioner is not supported by the evidence and does not demonstrate the conclusion that the prescribed rate is confiscatory.

■ The third contention, namely, that the allowance for depreciation is inadequate, arises out of the conflicting evidence of two expert witnesses. The contention does not present a question for the court. The finding of the Commission is supported by substantial evidence and is, therefore, conclusive on review.

The fourth contention is that the orders of the Commission require petitioner to provide storage in its transmission lines for the natural gas of a shipper. This objection is predicated upon the provision of the order reading:

"The transportation service rendered shall, in all ways, be equal to the firm deliveries made by the Company for itself or for others."

This, petitioner claims, requires it to retain the gas in its pipe lines until the shipper or his customer wants to use it, whereas it should be permitted to require the shipper to accept delivery of the gas from its line when the gas reaches the destination point. The provision of the order referred to continues with the explanation:

"During periods when service to any of the Company's customers is limited in any

part of the system for lack of capacity to serve, Shipper's consumers in a like classification and on the same part of the system may be limited to the same extent as are those of the Company."

This provision, as we understand it, is intended to enable the petitioner to treat its own customers and the customers of shippers with equal fairness and to prevent discrimination in favor of either group of customers or of consumers. If this view be erroneous, and if petitioner is required to retain a shipper's gas in its lines for a period longer than would be required to make immediate delivery, then the order permits the petitioner to include in the rate schedule, which it is required to file, a reasonable charge for "Suspension of Service." The objection, we think, is without substance.

The fifth point in this list of objections to the order is that no provision is made for minimum shipments.

 This is a speculative conjecture that householders, for instance residents of North Dakota, might purchase small gas producing plants in Montana and ship gas to themselves for their own use. There is no evidence that such a practice would possibly occur. Under such circumstances a court would not be warranted in setting aside a rate order. Brush Electric Co. v. Galveston, 262 U.S. 443, 43 S.Ct. 606, 67 L.Ed. 1076. Further, provision is made in the statute and in the regulations thereunder for taking care of such conditions when they arise. Section 4(d) of the Natural Gas Act, 15 U.S.C.A. § 717c(d), provides that "Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate * * *, except after thirty days' notice to the Commission and to the public * * *. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for * * *." And Part 54 of the Regulations provides for the form and contents of such notice of change. The objection so presented and argued is, therefore, without merit.

The sixth criticism of the orders is that they require no nominated demand by the shipper. By "nominated demand" petitioner explains that "the shipper must state the amount of his maximum shipment in any 24 hours, which statement will constitute a maximum limitation upon his shipments." Without such knowledge, it is said, the petitioner cannot make intelligent provision for the handling of its own load as a public utility.

This argument has no meritorious foundation in the order complained of. The order provides that "Service under this rate shall be provided under contract for 12-month periods * * *"; that petitioner may include in its rate schedule a requirement for an "Application for Service" by the shipper; and that the billing demand may be based upon "90% of the maximum day capacity requested in the application for service." Thus the order permits the petitioner with the approval of the Commission to require a reasonable "nominated demand." This should be equally as fair and satisfactory, if not more so, than would be a fixed "nominated demand" predetermined by the Commission.

The seventh point assailing the rate order as confiscatory is that the provisions for determining billing demand for transportation of natural gas will not provide payment by the shipper for his full demand on petitioner's system.

The order provides that the charge for transportation service shall be computed monthly at a rate consisting of two factors called a "Demand Charge" and a "Commodity Charge." The demand charge shall be: "$1.10 for each 1000 cubic feet of billing demand", and the commodity charge shall be: "7 cents for each 1000 cubic feet of gas delivered." Under the caption "Determination of Billing Demand", the order then provides:

"For the purpose of billing under this rate schedule, the billing demand shall be whichever of the following (a), (b) or (c) is the largest:

"(a) The largest amount of gas delivered in any regular 24-hour metering period during the current billing month.

"(b) 90% of the maximum day capacity requested in the application for service.

"(c) 90% of the largest amount of gas delivered in any 24-hour period of the preceding eleven months.

"Provided, however, that if deliveries on any day during the billing period were limited by the Company in any manner the billing demand shall be the least amount delivered in any such 24-hour metering period during which deliveries are so limited."

Computing the demand charge for one month at the rate provided for a shipper who had requested shipment of 1,000 mcf. as his maximum day capacity the charge will be 1,000 times $1.10 or $1,100 a month; and 12 times $1,100 or $13,200 for a year.

Petitioner assumes two hypothetical cases to illustrate that in practice it might not always receive the reasonable billing charge shown in the foregoing computation. In the first case it is assumed that the shipper actually ships a maximum of only 900 mcf. per day for 11 months of the year and 1,000 mcf. for one month, in which case the demand for the year would be only $11,990 instead of $13,200.

In the second illustration it is assumed that if for causes beyond petitioner's control it is required to shut off delivery for one day within any month, the shipper would, under the limiting clause in the order, pay no demand charge for the whole month.

 Upon consideration of the rule for determining the billing charge and of the evidence in reference thereto, it is obvious that the formula was designed to return to the petitioner fair and reasonable compensation for its services and to prevent discrimination against shippers. Its fairness was determined in the first instance by consideration of the petitioner's business for the years 1942 and 1943. In its petition for rehearing this same objection was raised and the rule was tested by a study of petitioner's business for the years 1945, 1946, and 1947. Applying such test the Commission found that the rule was just and reasonable. Until an actual test of the rate schedule is made showing that it results in some unfairness, the court cannot annul a prescribed rule for applying the rate to deliveries simply because petitioner can conceive a situation which considered in isolation might not return the amount hoped for.

Petitioner's eighth objection to the order is that the provision for computing the monthly billing demand charge by consolidating the deliveries on different parts of the system is improper. There is no claim that the rule is prejudicial to the rights of the petitioner. The claim that the method is not the same as the method employed by railroads in billing assignments of commodities over their lines proves nothing. The nature of the commodities shipped is different, and apt and appropriate methods of billing them may well be different. The Commission concluded that if the computation were based on individual instead of consolidated deliveries the rates would be lower than those ordered to the prejudice of petitioner.

Finally, petitioner assails as unreasonable the provision of the order reading:

"The shipper shall deliver to the Company as compensation for line losses, in addition to the gas tendered for transportation, an amount of gas for each one thousand (1000) cubic feet of gas delivered for account of Shipper at destination, such amount being equal to the average rate of loss from Company's transmission system during the preceding calendar year provided, however, that such amount shall not be greater than 100 cubic feet of gas for each 1000 cubic feet of gas so delivered.

"The Company may require a proportional adjustment in the amount of gas tendered for transportation when the heating value of Shipper's gas varies from that delivered to the Shipper by more than 2%."

 The limitation of a shipper's share in the line loss to 10% of the deliveries is asserted to be unfair because the evidence shows that petitioner's line losses for 1942 and 1943 exceeded 10% of deliveries to the shipper. The evidence, however, shows that, if field losses are excluded, the losses on the transmission lines, except on the line to Bismarck, are substantially less than 10%. It was further shown that the poor state of repair on the Bismarck line caused the unusual losses, but that the line was being rehabilitated at the time. When

fairly considered the evidence does not support the petitioner's criticism. The petitioner may not insist on a rate or regulation that will shift the cost of maintaining its lines to the shippers.

The criticism of the provision limiting adjustments for differences in heating values of gas to 2% is not based upon any evidentiary facts and is conjectural and wanting in substance.

Affirmed.