William B. MORROW, State Executive Director, New Mexico State ASCS Committee, Department of Agriculture, Gilbert Gomez, State ASCS Committeeman, Paul Simmons, State ASCS Committeeman, Paul Woofter, State ASCS Chairman, Appellants,

v.

G. V. CLAYTON and Adron D. Walker, Appellees.

No. 7279.

United States Court of Appeals Tenth Circuit.

Dec. 16, 1963.

Rehearing Denied Jan. 31, 1964.

Phillips, Circuit Judge, dissented.

John W. Douglas, Asst. Atty. Gen. (John G. Quinn, Jr., U. S. Atty., Alan S. Rosenthal and Pauline B. Heller, Attys. Dept. of Justice, on the brief), for appellants.

Thomas F. McKenna, of McKenna & Sommer, Santa Fe, N. M. (Shipley, Seller & Whorton, Alamogordo, N. M., on the brief), for appellees.

Before PHILLIPS, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

This case, brought under Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, and the Declaratory Judgment Act, 28 U.S.C.A. § 2201, involves cotton acreage allotments and marketing quotas for two farms located in Otero County, New Mexico, and operated by appellees. The questions presented are: (1) Whether the lower court had jurisdiction under the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq., to compel the members of the State Agricultural Stabilization and Conservation Committee[1] and its Executive Director to cancel the revised notices of marketing quota and excess and rescind the assessment of penalties, prior to administrative review by a Review Committee under 7 U.S.C.A. § 1363; and (2) whether the Administrator of the Agricultural Stabilization and Conservation Service[2] and the State Committee or its Executive Director, as duly designated officials and agents of the Secretary of Agriculture, had the authority to cancel the allotment transfers, revise marketing quotas and assess penalties under the facts of this case.

The United States acquired through eminent domain proceedings two farms located in Oklahoma and Texas and owned, respectively, by Vesta and J. D. Duncan and Carl T. Whitener. As a result of the condemnation of their farms, the Duncans and Whitener were "displaced owners" and, pursuant to 7 U.S.C.A. § 1378, their cotton acreage allotments for these farms were placed in a pool and could be transferred to any new farms acquired by them.

On February 16, 1961, the appellee, G. V. Clayton, and his wife entered into a contract for the sale of a farm located in Otero County, New Mexico, to the Duncans and on the same date entered into a similar contract with Whitener providing for the sale to him of a farm located in the same county. The contracts of sale provided that the sellers agreed to sell the farms, each for $24,000, and the buyers in payment of the purchase price were to execute and deliver to the Claytons promissory notes due and payable, in the case of the Duncans, on or before February 16, 1962, and, in the case of Whitener, in three equal installments of $8,000, starting on February 16, 1962. The Claytons agreed to execute a warranty deed to the purchaser of each farm upon payment of the purchase price in full. On the same date that the contracts of sale were executed, the parties entered into certain lease arrangements concerning the two farms. Each of these leases provided that the property covered thereby was leased

1. Hereinafter referred to as State Committee.

2. Hereinafter referred to as Administrator.

back to the Claytons for a period of 3 years commencing on February 16, 1961, at a total lump sum payment, payable in cash upon the legal and effectual transfer of the buyer's cotton acreage allotment to the land. However, the contract of sale and lease on each farm were to be cancelled if the allotment was not transferred. It was intended that the two farms were to be operated by the Claytons or their tenant, appellee Walker.[3]

Thereafter, the displaced farmers applied for the transfer of their pooled acreage allotments to the new farms stating that they had purchased the farms and certifying that they had "made no side agreement with any person for the purpose of obtaining an allotment from the allotment pool for a person other than myself." Copies of the contracts of sale, the promissory notes and the leases referred to above were attached to the applications and the displaced farmers appeared before the County Agricultural Stabilization and Conservation Committee [4] and submitted to inquiry. The minutes of that Committee indicate that it was fully aware of the fact that the farms had been purchased from the Claytons and then leased back to them. The County Committee determined that the applications to transfer the allotments to the new farms were proper and in accordance with the regulations and recommended that they be approved. The State Committee, pursuant to the applicable Department of Agriculture regulation,[5] approved the transfers subject to the following condition: "that if at any time in the future it became apparent to the State Committee that such transfers had been requested for the purpose of transferring allotments to New Mexico for subsequent sale the Committee would revoke such approval and the applicants' allotments would be transferred back into the pool and the applicants would be assessed marketing

quota penalties for each year the transferred allotment was harvested."

The County Committee thereafter issued a notice of farm acreage allotment and marketing quota for 1961 with respect to each of the farms containing an increased cotton acreage allotment based upon the transfer of the pooled allotment of the displaced farmers to the respective farms they had purchased under contract of sale. These notices did not specifically mention the condition imposed by the State Committee in granting its approval of the transfers, but did provide for revision thereof in the event any incorrect data or information was used in establishing the allotment. Similar acreage allotments, including the transferred allotments, were issued to each farm for 1962. The 1961 cotton crop was planted on each farm and harvested and the 1962 crop had been planted when the farmers were notified that the transfers were cancelled and penalties assessed.

It appears from the record that the attempted cancellations of the transferred allotments and assessment of penalties came about as the result of a reexamination made by the Administrator into the circumstances of the two transactions. It also appears that on May 1, 1962, after such examination had been made, members of the State Committee, its Executive Director and a representative of the Department of Agriculture met with the County Committee in regard to a letter from the State Committee directing the County Committee to "reduce all transferred allotments in cases where operators of farms of pooled allotments were previous owners to zero." After a full and lengthy discussion of the facts, the County Committee refused to cancel the transferred allotments as it felt that there had been a full disclosure of the facts and the allotments had been issued in accordance with procedure and regulations. The County Committee

3. The two contracts of sale were assigned to Walker by the Duncans and Whitener after the 1961 cotton crop was planted and harvested.

4. Hereinafter referred to as County Committee.

5. 7 C.F.R. § 719.12(d) (2).

was then directed to forward the pertinent records to the Department of Agriculture in Washington, which it did. It was also instructed to prepare and forward to Washington for issuance by the Administrator notices of revised allotments for 1961 and 1962 for all of the farms involved.

On May 3, 1962, the Administrator issued revised notices of farm acreage allotments and marketing quotas for 1961 and 1962, which cancelled the transferred allotments on the basis that the arrangements between the parties did not result in bona fide ownership of the farms by the Duncans and Whitener, within the meaning of 7 U.S.C.A. § 1378 and the applicable regulations, 7 C.F.R. § 719.12 (d) (2), but constituted a device or scheme to transfer pooled cotton allotments for the benefit of a person other than a displaced farmer. On May 14, the Executive Director issued notices for each farm of farm marketing excess, farm marketing quota and penalty due for the 1961 cotton crop on the basis of the cancellations. Applications for review of these notices were filed by appellees under 7 U.S.C.A. § 1363. A hearing was scheduled on the applications before a Review Committee on September 24, 1962, but before the hearing was held the request therefor was withdrawn by counsel for Clayton.

Clayton then commenced this action on August 7, 1962, alleging, among other things, that a Review Committee under § 1363 had no jurisdiction or authority to review the actions of the Administrator and the State Committee or its Executive Director, that hearings before such a Committee were nevertheless being scheduled, which would cause him irreparable harm, and that he had no adequate remedy at law. He sought an order of the court: (1) Declaring that the notices of cancellation of the transferred allotments and assessment of penalties were null and void; (2) declaring that there was no jurisdiction in the Review Committee to review the actions cancelling the transferred allotments and assessing penalties; (3) declaring that

the transferred allotments to the new farms were duly and properly made and restoring the same; and, (4) directing that the proposed or scheduled hearings not be held before the Review Committee. Walker, as the owner-operator of the two farms under the assigned contracts of sale, was allowed to intervene and he prayed for substantially the same relief as Clayton.

Appellants' motion to dismiss or, in the alternative, for summary judgment on the ground of lack of jurisdiction over the subject matter was denied. Appellees' motion for summary judgment was sustained and this appeal followed.

The complex statutory scheme of the Agricultural Adjustment Act of 1938, as amended, is basic to a clear understanding of this case and must be discussed at some length. The policy of the Act as set forth in 7 U.S.C.A. § 1282 is, among other things, to conserve natural resources, prevent the wasteful use of soil fertility and maintain and rebuild farm and ranch land resources and this policy is accomplished, in part, by providing for the establishment of marketing quotas for cotton and other crops. The purpose of the Act is to " * * * limit national and individual farm production and marketing to the quotas allotted, * * *." Rodgers v. United States, 332 U.S. 371, 375, 68 S.Ct. 5, 92 L.Ed. 3; Fulford v. Forman, 5 Cir., 245 F.2d 145. And, " * * * [c]ontrol of total supply, upon which the whole statutory plan is based, depends upon control of individual supply." Wickard v. Filburn, 317 U.S. 111, 130, 63 S.Ct. 82, 87 L.Ed. 122.

With respect to cotton, Congress expressly found that farmers were in need of Federal assistance to effectively prevent the recurrence of excessive supplies of cotton and that the provisions for cotton marketing quotas contained in the Act were necessary to promote and maintain an adequate supply of cotton and prevent an excessive supply thereof. 7 U.S.C.A. § 1341. To implement the expressed policy and the clear purpose of

the Act, 7 U.S.C.A. § 1342 provides: "Whenever during any calendar year the Secretary [of Agriculture] determines that the total supply of cotton for the marketing year beginning in such calendar year will exceed the normal supply for such marketing year, the Secretary shall proclaim such fact and a national marketing quota shall be in effect for the crop of cotton produced in the next calendar year. * * * " Whenever a national marketing quota is proclaimed, the Secretary must " * * * determine and proclaim a national acreage allotment for the crop of cotton to be produced in the next calendar year * * * " and a formula is provided for that purpose. 7 U.S.C.A. § 1344(a). The national acreage allotment must be apportioned to the states according to a specified formula. 7 U.S.C.A. § 1344 (b) (c) (d). The state acreage allotment is then apportioned by the State Committee among the counties of that state, 7 U.S.C.A. § 1344(e), and finally by the county committee to the individual farms. 7 U.S.C.A. § 1344(f). Penalties upon a farmer for marketing an excess amount of cotton over and above his quota are provided and such penalties are a lien, in favor of the United States, on the entire crop of cotton produced on his farm. 7 U.S.C.A. § 1346.

The Act authorizes the Secretary to " * * * prescribe such regulations as are necessary * * * " for its enforcement. 7 U.S.C.A. § 1375(b). It also provides in 7 U.S.C.A. § 1388 that the Secretary, in the administration of its provisions, shall utilize the same local, county and state committees as are utilized under the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590a et seq.[6] It should be emphasized here that the members of the State Committee are appointed by the Secretary and must be residents of that state. The county committeemen are selected by the farmers themselves through delegates representing them at a county convention.

The Secretary has issued certain regulations pertaining to the purposes and powers of the county committee. 7 C.F.R. § 7.3 (March 23, 1961), details the purposes of these committees to be "to direct the administration of * * * the Agricultural Adjustment Act of 1938 * * * and any amendments to such acts, and such other acts of Congress as the Secretary of Agriculture or Congress may designate. This shall be done through community committeemen and other personnel responsible to the county committee, and in accordance with applicable laws, regulations, and official instructions. * * * " The duties of the county committee are set out in

---

6. Section 590h(b) of that Act provides for the organization of state, county and local committees, as follows: " * * * The Secretary shall designate local administrative areas as units for administration of programs under this section. No such local area shall include more than one county or parts of different counties. Farmers within any such local administrative area, and participating or cooperating in programs administered within such area, shall elect annually from among their number a local committee of not more than three members for such area and shall also elect annually from among their number a delegate to a county convention for the election of a county committee. The delegates from the various local areas in the county shall, in a county convention, elect, annually, the county committee for the county which shall consist of three members who are farmers in the county. * * * In any county in which there is only one local committee the local committee shall also be the County Committee. In each State there shall be a State committee for the State composed of not less than three or more than five farmers who are legal residents of the State and who are appointed by the Secretary. The State director of the Agricultural Extension Service shall be ex officio a member of such State committee. The ex officio members of the county and State committees shall be in addition to the number of members of such committees hereinbefore specified. The Secretary shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs. * * * "

7 C.F.R. § 7.20 (March 23, 1961), in part: "The county committee, subject to the general direction and supervision of the State committee, and acting through community committeemen and other personnel, shall be generally responsible for carrying out in the county the agricultural conservation program, the price support programs as assigned, the acreage allotment and marketing quota programs, * * * and any other program assigned to it by the Secretary of Agriculture or the Congress. * * * "

It is provided that " * * * Notice of the farm marketing quota of his farm shall be mailed to the farmer", and "[n]otice of the farm acreage allotment established for each farm shown by the records of the county committee to be entitled to such allotment shall insofar as practicable be mailed to the farm operator in sufficient time to be received prior to the date of the referendum." 7 U.S. C.A. § 1362. If a farmer is dissatisfied with the farm marketing quota established by the County Committee, he may seek a review thereof under 7 U.S.C.A. § 1363.[7]

Appellants first contend that the lower court did not have jurisdiction of this suit because, they assert, the appellees failed to exhaust the statutory administrative remedy provided by § 1363. In support of this contention, they point out: The statute provides that "any farmer" may have his marketing quota reviewed by a local review committee; if the farmer is dissatisfied with the determination of the review committee, he may then proceed by a bill in equity filed in the District Court against the review committee, 7 U.S.C.A. § 1365; and the review by the court is limited to questions of law and the findings of fact made by the review committee are conclusive, if supported by evidence, 7 U.S.

C. § 1366. The appellants also point out that appellees did, in fact, apply for review under § 1363 and that the requests for hearing on such applications were withdrawn after hearings were scheduled. Appellees, in countering this position, admit that they filed, and withdrew the requests for a hearing on, the applications for review, but, argue that this was proper because the review committee under § 1363 does not have jurisdiction since that statute applies only where there is an adverse decision by the county committee and here there was no such decision as the actions complained of were taken by the Administrator and the State Committee or its Executive Director.

It has been held in numerous cases, as pointed out by appellants, that the district court does not have jurisdiction in a situation where a farmer has failed to exhaust his administrative remedy by proceeding under § 1363. The exhaustion of this administrative remedy is a prerequisite to court review under certain circumstances and may not be bypassed. See, e. g., Rigby v. Rasmussen, 10 Cir., 275 F.2d 861; Corpstein v. United States, 10 Cir., 262 F.2d 200, cert. denied, 359 U.S. 966, 79 S.Ct. 877, 3 L.Ed. 2d 834; Weir v. United States, 8 Cir., 310 F.2d 149, and other cases therein cited. But, we do not think those cases are applicable here. They are distinguishable from this case in that they involve situations in which the county committee acted adversely to the farmer and he did not avail himself of the administrative remedy provided by § 1363 before commencing proceedings in the district court. Those cases are therefore predicated upon an adverse decision by a county committee and there has been no such adverse decision to the farmers in this case.

---

7. "Any farmer who is dissatisfied with his farm marketing quota may, within fifteen days after mailing to him of notice as provided in section 1362 of this title, have such quota reviewed by a local review committee composed of three farmers from the same or nearby counties appointed by the Secretary. Such committee shall not include any member of the local committee which determined the farm acreage allotment, the normal yield, or the farm marketing quota for such farm. Unless application for review is made within such period, the original determination of the farm marketing quota shall be final."

It has also been held that, under § 1363, the Review Committee has no review power over matters of statewide or national concern such as the apportionment of the state acreage allotment to the various counties of the state. Fulford v. Forman, 5 Cir., 245 F.2d 145. In that case the court said (245 F.2d at 149):

> "If, as claimed, the language of Section 1363, note 4, supra, is so broad that a county Review Committee can review the action of the State Committee in allocating the State Reserve (or any of its other functions), so it can pass upon the actions of the Secretary himself, not only in allocating that State's acreage, but in the making of many other indispensable determinations. What would this do to the organic whole?"

And, after discussing the consequences of allowing the numerous local Review Committees to review actions of the higher authorities other than the county committees, the court said (245 F.2d at 153):

> "We need not consider whether Congress might have delegated so much to so many free from traditional Governmental responsibility. We need only say what is too patent: Congress did not do so. Only by such a construction may we ' * * * preserve the vitality of the Act and the utility of the language * * *,' Sunshine Anthracite Coal Company v. Adkins, 310 U.S. 381, 392, 60 S.Ct. 907, 912, 84 L.Ed. 1263, 1270, and assure a result ' * * * which effectuates rather than frustrates the major purpose of the legislative draftsmen,' Shapiro v. United States, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787, 1806."

■ The directive in this case from the State Committee to the County Committee to "reduce all transferred allotments in cases where operators * * *

were previous owners to zero" was apparently made to effectuate a statewide policy. It was not directed to the Duncan and Whitener transfers only, but to all such transfers. Under the rule of the Fulford case, the Review Committee therefore did not have the power of review.

■ A careful examination of the provisions of the Act reveals that Congress never intended for the Review Committee to have jurisdiction to review the administrative actions of the State Committee, the Administrator, the Secretary or their duly authorized agents at a level above the county committee. It follows that the appellees have no administrative remedy and they cannot be required to exhaust something which they do not have. Pan American Petroleum Corporation v. Pierson, 10 Cir., 284 F.2d 649, 656, cert. denied, 366 U.S. 936, 81 S.Ct. 1661, 6 L. Ed.2d 848.

Having determined that the lower court does have jurisdiction, the next question to be resolved is whether the Secretary and his duly authorized officials and agents had the authority to administratively cancel the transfer of the allotments, revise the cotton acreage allotments and marketing quotas for the two farms and assess the penalties in question. The asserted basis for the cancellation, revision and assessment of penalties was that the allotment transfers were obtained by fraud, error and in violation of applicable regulations.

The Secretary of Agriculture, as head of the Department of Agriculture, has full power and authority over, and is responsible for, the administration of national agricultural programs. 5 U.S.C. A. §§ 511, 512, 516a, 516b; Reorganization Plan No. 2 of 1953, 67 Stat. 633, 5 U.S.C.A. § 133z–15.[8]

■■ This power and authority to be exercised by the Secretary in administering the various programs must be found

---

8. Section 1 of that Plan reads, in part, as follows:

"* * * [T]here are hereby transferred to the Secretary of Agriculture all functions not now vested in him of all other officers, and of all agencies and employees, of the Department of Agriculture."

in, and is limited by, the statutes pertaining to such programs, as is the case with all administrative agencies. Federal Trade Commission v. National Lead Company, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438; Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733; Montana-Dakota Utilities Co. v. Federal Power Commission, 8 Cir., 169 F.2d 392, cert. denied, 335 U.S. 853, 69 S.Ct. 82, 93 L.Ed. 401. However, it is a fundamental principle of administrative law that the powers of an administrative agency are not limited to those expressly granted by the statutes, but include, also, all of the powers that may fairly be implied therefrom. Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325; United States v. Pennsylvania Railroad Company, 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499; United States v. Bailey, 9 Pet. 238, 34 U.S. 238, 9 L.Ed. 113. The rule in this respect is well stated in 1 Am.Jur. 2d, Administrative Law, § 44, p. 846:

"The court is not limited to the mere words of a statute or what is expressly declared therein, and that which is incidentally necessary to a full exposition of the legislative intent should be upheld as being germane to the law. In the construction of a grant of powers, it is a general principle of law that where the end is required the appropriate means are given and that every grant of power carries with it the use of necessary and lawful means for its effective execution. There is therefore conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed."

██ The program with which we are concerned here is contained in 7 U. S.C.A. § 1378.[9] That statute was enacted in 1958 to provide "a uniform law for the transfer of acreage allotments where farmland is acquired by an agency having the power of eminent domain." 1958 U.S.Code Cong. and Adm.News, pp. 4134–4135. Its obvious purpose is to allow a farmer to retain and transfer to a new farm that he has purchased the allotments that were established for a farm taken from him under the power of eminent domain. It does not create new acreage allotments and it does not permit the sale of allotments. It merely allows the transfer of allotments already in existence.

Pursuant to the authority granted in § 1375(b), the Secretary has promulgated regulations governing the procedure for transferring allotments under the statute. One of such regulations [10] requires

---

9. This section, in pertinent part, provides: "* * * the allotment determined for any commodity for any land from which the owner is displaced because of acquisition of the land for any purpose, other than for the continued production of allotted crops, by any Federal, State, or other agency having the right of eminent domain shall be placed in an allotment pool and shall be available only for use in providing allotments for other farms owned by the owner so displaced. Upon application to the county committee, within three years after the date of such displacement, * * * any owner so displaced shall be entitled to have established for other farms owned by him allotments which are comparable with allotments determined for other farms in the same area which are similar * * *. After such

allotment is made under this section, the proportionate part, or all, as the case may be, of the past acreage used in establishing the allotment most recently placed in the pool for the farm from which the owner was so displaced shall be transferred to and considered for the purposes of future State, county, and farm acreage allotments to have been planted on the farm to which allotment is made under this section. * * *"

10. 7 C.F.R. § 719.12(d) (2) provides, in part, as follows: "Upon written application by the displaced owner * * * to the county committee of the county in which the farm which is to receive allotment from the pool is located, the county committee shall determine whether the trans-

that an applicant for a transfer certify that he has made no side agreement with anyone for the purpose of obtaining a transfer of an allotment for a person other than himself. In other words, the regulation is designed to comply with the Congressional intent by requiring that the transfers be made in good faith for the purpose of benefiting the displaced farmer and no other person. The regulation also provides that an approved transfer may be cancelled in the event it is later determined that it was obtained by misrepresentation or fraud.

We think the promulgation of the regulation by the Secretary was a lawful exercise of the power and authority vested in him to administer the program of transferring allotments and that it is valid. The statute, of course, does not expressly provide that an approved transfer may be cancelled. But, in our view, that power is conferred by necessary implication so as to give the Secretary every power "proper and necessary to the exercise of the powers and duties expressly given and imposed." This is especially true in situations where, as here, it is alleged that fraud has been committed or misrepresentations made in the transaction. The Secretary not only has the power to act in such a situation but he has the duty to do so.

Appellees apparently do not question the validity of the regulation but they do argue that the regulation vests exclusive authority in the County Committee to cancel approved transfers and that under the doctrine of Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403, and United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, the Secretary was bound by the regulation so that only the County Committee could cancel the allotment and it refused to do so. We think the Service and Accardi cases are distinguishable from this case on the facts. Neither of those cases involve administrative action taken for the purpose of correcting administrative decisions based upon grounds of alleged fraud and misrepresentation.

It is true the regulation provides that if "it is later determined *by the county committee* that the transfer was obtained by misrepresentation by or on behalf of the applicant the allotment for the farm shall be reduced by the amount of the transfer for each year the transfer purportedly was in effect. * * *" (Emphasis supplied). But, there has really been no overriding of this provision of the regulation in this case. As a general proposition of administrative law, the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direc-

action by which the displaced owner claims to have acquired the farm to which it is requested that the allotment be transferred and the requested transfer is for the purpose of re-establishing the farming operations of the displaced owner or is a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the displaced owner. The application for transfer shall contain a certification by the applicant that he has made no side agreement with any person for the purpose of obtaining an allotment from the allotment pool for a person other than himself. Before an application is acted upon by the county committee the applicant shall personally appear before the county committee after reasonable notice and bring with him all pertinent documents for examination by the committee and answer all pertinent questions bearing on the proposed transfer, * * *. If an allotment is transferred hereunder and it is later determined by the county committee that the transfer was obtained by misrepresentation by or on behalf of the applicant the allotment for the farm shall be reduced by the amount of the transfer for each year the transfer purportedly was in effect * * *. The action of the county committee in approving or disapproving an application or in reducing the allotment for misrepresentation shall be effective only upon approval of the State committee or its representative and the issuance of an appropriate allotment notice under the applicable commodity regulations. * * *"

tion of the superior or the power to administer is vested in the superior. Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974; 2 Am.Jur.2d, Administrative Law, § 541, pp. 351–352. In the case at bar, the Administrator and the State Committee, as the superiors of the County Committee and under proper delegations of authority by the Secretary,[11] have merely exercised that power to review and revise the subordinate's acts.

It is also true that the Secretary is directed to utilize the committees set up by 16 U.S.C.A. § 590h, in administering the provisions of the Act. 7 U.S.C.A. § 1388. But, it does not follow that the Secretary, by utilizing such committees, abdicates his authority in, and responsibility for, administering the Act. There is no provision in the statutes that these committees shall have the sole or exclusive authority to perform the functions entrusted to them. Nor is there any provision ousting the Secretary of his authority in situations where, contrary to the plain Congressional intent, the county committee acts or refuses to act. The regulation, 7 C.F.R. § 7.20, supra, expressly provides that the county committees are subject to the general direction and supervision of the State Committee. Section 1344(g) (2) emphasizes that the ultimate responsibility for apportioning the county acreage allotment among the farms in the county rests upon the Secretary although he may act "through the local committees". Moreover, while § 1363 provides that the original determination of the farm marketing quota shall be final unless a review thereof is sought by the farmer, no such provision is made in § 1378 with respect to transfers of pooled allotments. That section merely provides that the displaced farmer is to file his application for transfer with the county committee and that, upon such application and a proper showing, the farmer shall be entitled to the transfer. It does not provide that the county committee shall have exclusive authority to grant the application and it does not provide that the decision of the county committee shall be final. It therefore follows that the Secretary and his subordinates, under proper delegations of authority, have the authority to refuse to approve fraudulent transfers or to cancel and set aside transfers which are later determined to be fraudulent. Unless he does have this authority, the Secretary is not equipped to meet his responsibilities. This conclusion finds support in the recent case of Boesche v. Udall, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491, where the Supreme Court held that the Secretary of Interior had administrative authority to cancel oil and gas leases on public lands for invalidity at their inception, i. e., for fraud. Here, as in the Boesche case, the asserted ground for cancellation is fraud and the allotment transfers were kept within the administrative control of the Secretary by conditioning the approval of the transfers as hereinbefore related.

We conclude that the Secretary and his agents, under proper delegations of power, have the authority to cancel the allotment transfers and revise marketing quotas as well as to assess the penalties provided by statute, in situations where the transfers are obtained by fraud or misrepresentation. But he must be able to establish a basis for such cancellation, i. e., fraud or misrepresentation, and the record in this case clearly discloses a dispute as to whether the transfers were obtained by such means. This issue must be resolved by findings of fact and conclusions of law, after a full hearing thereon.

Reversed and remanded for further proceedings consistent herewith.

PHILLIPS, Circuit Judge (dissenting).

7 U.S.C.A. § 1388(a) provides that the Secretary in administering the provisions of the Act "shall * * * utilize the same local, county, and State committees as are utilized under" the Soil Con-

---

11. Reorganization Plan No. 2 of 1953, 67 Stat. 633, 5 U.S.C.A. § 133z–15.

servation and Domestic Allotment Act (16 U.S.C.A. § 590(a) et seq.). The State and County Committees here involved are those so to be utilized. 7 U.S.C.A. § 1375(b) authorizes the Secretary to "prescribe such regulations as are necessary for the enforcement of" the Act.

Pursuant to the authority granted to the Secretary by 7 U.S.C.A. § 1375(b), supra, the Director, ASCS, promulgated an amendment to 7 CFR 719.12(d) (2) on February 17, 1961, (26 F.R. 1396) for the stated purpose of making "the procedures for the transfer of allotment from the pool under 7 U.S.C. 1378 more effective in preventing the sale of allotments from the pool or the transfer of allotments from the pool for the benefit of some person other than the displaced owner." Such amendment provides in part as follows:

"Upon written application by the displaced owner * * * to the county committee of the county in which the farm which is to receive allotment from the pool is located, the county committee shall determine whether the transaction by which the displaced owner claims to have acquired the farm to which it is requested that the allotment be transferred and the requested transfer is for the purpose of reestablishing the farming operations of the displaced owner or is a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the displaced owner. The application for transfer shall contain a certification by the applicant that he has made no side agreement with any person for the purpose of obtaining an allotment from the allotment pool for a person other than himself. Before an application is acted upon by the county committee the applicant shall personally appear before the county committee after reasonable notice and bring with him all pertinent documents for examination by the committee and answer all pertinent questions bearing on the proposed transfer, * * *. If an allotment is transferred hereunder and it is later determined *by the county committee* that the transfer was obtained by misrepresentation by or on behalf of the applicant the allotment for the farm shall be reduced by the amount of the transfer for each year the transfer purportedly was in effect * * *. The action of the county committee in approving or disapproving an application or in reducing the allotment for misrepresentation shall be effective only upon approval of the State committee or its representative and the issuance of an appropriate allotment notice under the applicable commodity regulations." (Italics supplied.)

By issuing this regulation the Administrator, ASCS, in behalf of the Secretary, carried out the direction of 7 U.S.C.A. § 1388(a), supra, by utilizing the County Committees to make the initial determination of whether applications for transfers are made in good faith for a proper purpose and further by utilizing such County Committees to make later determinations of whether such transfers were obtained by misrepresentation.

In the instant case, the County Committee, when requested by the State Committee to reduce to zero all transferred allotments in cases where the operators of farms having such transferred allotments were previous owners, made the determination it was directed to make by the regulation. The fact that such determination was contrary to the apparent determination made by the State Committee is of no moment, since the regulation does not give the State Committee power to make such initial determination for purposes of reducing the allotment by the amount of the transfer.

The State Committee contends that the Secretary of Agriculture and the duly designated subordinate officials of his department have authority to cancel transfers of allotments for fraud, error or failure to comply with regulations under the general power of the Secretary respecting agricultural programs and that

the exercise of authority by an agent does not divest the principal of his authority.

What authority the Secretary might have had prior to the promulgation of the amendment to 7 CFR 719.12(d) (2), is not here material. By such amendment the Secretary took away from himself and his subordinates, other than the County Committees, the authority to make initial determinations that transferred allotments were obtained by misrepresentation.[1]

"[R]egulations validly prescribed by a government administrator are binding upon him as well as the citizen,"[2] and the Secretary and his subordinates are bound to follow the procedure set forth in 7 CFR 719.12(d) (2), supra. The State Committee did not follow such procedure when it caused revised notices of acreage allotments reducing the allotments on the Whitener and Duncan farms by the amount of the transfer "because requirements of Section 719.12 of the Regulations (26 FR 1396) issued February 17, 1961, have not been met." The State Committee cites numerous regulations which give it, the Secretary, the Assistant Secretary, or the Administrator, authority to revise or correct determinations of the County Committee or to make such determinations in the first instance. None of these are applicable to the factual determination here made by the County Committee. 7 CFR 722.-531(b) and (c) relate to revisions of determinations made under 7 CFR 721.517 to 7 CFR 722.528. 7 CFR 722.431(b) relates to revisions of determinations made under 7 CFR 722.417 to 7 CFR 722.428. 7 CFR 722.431(c) relates to initial determinations made under 7 CFR 722.411 to 7 CFR 722.431(b). And 7 CFR 722.46(c) relates to initial determinations made under 7 CFR 722.1 to 7 CFR 722.51.

Counsel have not cited and we have not found any regulations which authorize anyone other than the County Committee to make a determination that transferred allotments were obtained by misrepresentation for purposes of reducing the allotment by the amount of the transfer. But if such authority did rest in the Secretary of Agriculture or in any of his subordinates, it was not validly exercised in the instant case, in my opinion. After the County Committee had refused to "reduce all transferred allotments in cases where operators of farms of pooled allotments were previous owners to zero," or to find at the request of the State Committee, its officers, and the representative of the Department of Agriculture that the transfers were "obtained by misrepresentation by or on behalf of the" applicants and by reason thereof to reduce the allotments for the farms by the amount of the transfer for each year the transfer was in effect, the representative of the Department of Agriculture and the State Committee and its officers, without any notice to Clayton and Walker, and without any hearing or opportunity for a hearing being accorded Clayton and Walker, proceeded to attempt to cancel the transferred allotments of Clayton and Walker. Surely, administrative power, if it existed, could not be exercised in any such manner on the ground of misrepresentation by or on behalf of the applicants. For these reasons, I think the judgment below should be affirmed and respectfully dissent.

1. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681.

2. Service v. Dulles, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403; See also: Accardi v. Shaughnessy, 347 U.S. 260, 266, 267, 74 S.Ct. 499, 98 L.Ed. 681; Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221, 224.